## SHELL v. DUNCAN.

1. Under the law of this State (*Gen. Stat.*, § 313), one holding the county auditor's deed for land purchased at a delinquent land sale for non-payment of taxes, has *prima facie* good title, and is, therefore, entitled to recover this land from the person in whose name it was listed and sold, unless such person proves a non-compliance with the necessary legal prerequisites to the sale, and unless, perhaps, the auditor's deed shows upon its face such non-compliance. MR. JUSTICE McGOWAN, *dissenting*.

2. The supply act of December, 1885, provided that all taxes therein assessed should be paid not later than December 15, 1886, and delinquent lands should be sold on the first Monday of March in 1887. In December, 1886, the legislature extended the time for the payment of taxes to January 15, 1887. Section 552 of the General Statutes gives to the comptroller general, with the approval of the governor, power to extend the time for the collection of taxes, and when so extended, to postpone the time within which the penalties imposed by law would attach. *Held*, that the comptroller general had the power, with the governor's approval, to postpone the tax sales from March to April, and the auditor's deed having recited such a postponement by the comptroller general, and a sale on salesday of April, the governor's approval will be presumed, and the purchaser takes *prima facie* a good title. MR. JUSTICE McGOWAN, *dissenting*.

3. Incorrect, but immaterial, recitals in an auditor's deed do not vitiate it; nor is the validity of the deed affected by its failure to recite the performance of all necessary prerequisites to a tax sale.

4. A purchaser at a tax sale takes the land discharged from the taxpayer's right of homestead therein.

5. Under the law declaring taxes to be a lien upon the property taxed, the lien to attach at the beginning of the tax year, and to be a prior lien, but that only the tax debtor's right and title shall be sold for non-payment, the lien for taxes is not given priority over the previously attached inchoate right of dower of the tax debtor's wife. Whether the legislature could constitutionally subordinate a wife's dower in her husband's lands to taxes subsequently imposed, raised, but not determined.

6. The inchoate right of dower is a substantial right of property and not a lien.

Before KERSHAW, J., Laurens, September, 1888.

The separate opinion of Mr. Justice McGowan fully states the case as follows:

This was an action to marshal and settle the estate of John T. Duncan, deceased, brought by G. W. Shell, as administrator with the will annexed. The complaint alleges that John T. Duncan died seized of 1,284 acres of land, but considerably involved, and that the sale of the land was necessary for the payment of the debts of the deceased. The widow, Elliott Duncan, an adopted daughter of the deceased, Susan E. P. Duncan, a minor, and the National Bank of Newberry, a creditor in judgment, were made parties defendant. The widow, by her answer, claimed dower in the land, and homestead in both land and personalty. The Bank of Newberry claimed a lien upon the land. The cause was referred to the master, who called in the creditors, and among them came in James W. Copeland, who set up a judgment as assignee against the testator, Duncan, and also title to 1,200 acres of the land, by virtue of a purchase at a sale of the land at a delinquent land sale for taxes, and a deed therefor from the auditor of Laurens County, a copy of which is found in the "Case."

The master, among other things not now before us, reported as to the claim to the land under tax title, as follows: "The taxes for which the land was sold were for the fiscal year commencing November 1st, 1885. The act of the legislature to raise supplies and make appropriations for that year provided by section 8, 'that all taxes therein assessed should be due and payable from 15th day of October, 1886, to the 15th day of December, 1886,'

and by section 12, 'that all real property returned delinquent by the treasurer shall be offered for sale on the first Monday in March, 1887, after due advertisement,' as provided by law. The first Monday in March, 1887, was the 7th of the month. The deed from the auditor to James W. Copeland refers to it as if it was on the 4th day of the month. The deed recites, too, that by virtue of authority of an act entitled 'An act to regulate the time for collecting taxes by execution or distress,' approved December 24, 1886, 'the comptroller general extended the time for the advertisement and sale of delinquent lands in Laurens County, so that the sale thereof might be held on the 4th day of April, 1887, and the county auditor of Laurens County, pursuant thereto, advertised the above described property in the Laurensville Herald for two weeks as delinquent lands, to be sold by the county treasurer of Laurens County on that day; and that at a sale so made by the county treasurer of Laurens on that day, James W. Copeland, offering to pay the amount of the taxes, assessments, and penalties ($113.78) charged on the above described property, for the least quantity thereof, to wit, twelve hundred acres, became the purchaser, and having paid that amount into the county treasury, a certificate of purchase for the quantity so sold was given to him accordingly, &c.'

"Now, as we have seen, the act of December 24, 1886, does not give the authority to the comptroller general to extend the time for the advertisement and sale of delinquent lands, but merely provides that county treasurers shall not proceed to collect taxes by execution or distress until ten days after the 15 per cent. penalty has attached, &c. Section 552 of the General Statutes (1882) does provide that 'the comptroller general, with the approval of the governor, may extend the time for the performance of the duties imposed upon the county officers, or for the assessment and collection of taxes; and when such collection and assessment of taxes are necessarily delayed, the comptroller general may postpone the time within which the penalties imposed by law would attach,' &c. * * * Did the comptroller general, with the approval of the governor, have the authority of this section—to extend the time for the advertisement and sale of delinquent lands? If so, he also had the authority to extend the time for the pay-

ment of taxes beyond that fixed by the act of December, 1885, making the assessment for the fiscal year commencing November 1, 1885, and also to extend the time within which penalties would attach, for the section seems to relate particularly to the doing of those things; and yet it seems to have been considered necessary for the legislature to extend the time by special enactment. I think it very doubtful whether the comptroller general had authority, even with the approval of the governor, to extend the time for the advertisement and sale of delinquent lands, in the face of the positive language of the act of December 24, 1885, that lands delinquent under the assessment made by that act 'shall be offered for sale on the first Monday in March, 1887,' &c. The deed to Copeland merely recites that he presented the certificate of sale. I conclude that this deed must be held to be void," &c., &c.

The cause coming on for trial by Judge Kershaw, he said that after a review of the very able and elaborate report of the master, he could discover no error in it. "The tax title bears on the face of the deed evidence of a departure from the strict and rigid requirements of the law necessary to sustain a proceeding which divests the citizen of his freehold." From this decree James W. Copeland has appealed to this court upon the following grounds: "1st. Because his honor erred in confirming and sustaining so much of the master's report herein as held that the tax title set up by James W. Copeland was void and invalid. 2nd. Because his honor erred in confirming and sustaining so much of the master's report herein as held that the widow, Elliott Duncan, was entitled to dower and homestead in the lands of John T. Duncan, covered by the tax title of Copeland, as against the said tax title," &c.

The auditor's deed was in the usual form, and bore date May 10, 1888, but contained the following recitals:

Whereas, by an act of the general assembly of the State of South Carolina, entitled "An act to provide for the assessment and taxation of property," approved March the 9th, 1882, it is provided that each county auditor in this State shall annually cause the list of delinquent lands in the county to be published weekly for two weeks, between the 10th day of February and the 1st Monday in March, in one newspaper, and no more, published

in his county, and if no paper be published in said county, then in some newspaper having the most general circulation therein, to which list shall be attached a notice in the following form, to wit: Notice is hereby given that each of the said parcels of land, or so much thereof as shall be necessary to pay the taxes, penalties, and assessments charged thereon, will be sold by treasurer of Laurens County, South Carolina, at his office in said County, on the 4th day of March, A. D. 1887, unless said taxes, assessments, and penalties be paid before that time, and said sale will be continued from day to day until all of the said parcels of land shall be sold or offered for sale; and, whereas, there appears on the tax duplicate of Laurens County, for the year 1886, certain real estate, consisting of twelve hundred and eighty-four acres of land, assessed in the name of John T. Duncan, and valued at six thousand five hundred and seventy dollars, the taxes, assessments, and penalties charged thereon amounting to one hundred and thirteen dollars and seventy-seven cents; and, whereas, the above named John T. Duncan neglected to pay to the county treasurer of Laurens County the above taxes, assessments, and penalties, as prescribed by law; and, whereas, in accordance with the provisions of an act of the general assembly of the State of South Carolina, entitled "An act to regulate the time for collecting taxes by execution or distress," approved December 24th, A. D. 1886, the comptroller general extended the time for the advertisement and sale of the delinquent lands in Laurens County, so that the sale thereof might be held on the 4th day of April, 1887, and the county auditor of Laurens County, pursuant thereto, advertised the above described property in the Laurensville Herald for two weeks as delinquent land, to be sold by the county treasurer of Laurens County on that day. And, whereas, at a sale so made by the county treasurer of Laurens County on that day, James W. Copeland, offering to pay the amount of the taxes, assessments, and penalties charged on the above described property, for the least quantity thereof, to wit, twelve hundred acres, became the purchaser, and having paid the said amount into the county treasury, a certificate of purchase for the quantity so sold was given to him accordingly; and by section 297 of the General Statutes of the State of South Carolina, it is provided that no deed shall be made for any real estate sold at delinquent land sale until the expiration of ninety-one days from and after such sale, nor shall any survey thereof, required by any certificate of purchase, be made until the expiration of the same period of time; and, whereas, the period of ninety one days having elapsed since the sale, so held as aforesaid, the said James W. Copeland has presented a certificate of purchase to the county auditor of Lau-

rens County, and the taxes and assessments levied on the real estate described therein have been so far paid as that the same is not again delinquent. Now, therefore, I, G. M. Langston, county auditor of the County of Laurens, in consideration of the premises, and in further consideration of the sum of two dollars, &c.

*Mr. H. Y. Simpson,* for appellant.

*Messrs. Ball & Watts, Ferguson & Featherstone,* and *Suber & Caldwell,* contra.

November 23, 1889. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. This case involves the validity of a tax title, under which James W. Copeland, appellant, claims the land in dispute. The facts of the case will be found stated in the "Case," and therefore they are omitted here, except so far as may be necessary to a proper understanding of this opinion. The land became delinquent in the fiscal year commencing November 1, 1885. Under the act to raise supplies and make appropriations for that year all taxes became due and payable from the 15th of October to the 15th of December, 1886, and by the twelfth section thereof all real property returned delinquent, &c., was required to be offered for sale on the first Monday in March, 1887, after due advertisement as "now provided by law," the act of 1882 having provided two weeks' advertisement. If there had been no change, the delinquent lands under this act should have been sold on the 1st Monday in March, 1887, after advertisement of two weeks, as therein provided ; but the general assembly of 1886, to wit, on the 24th of December, 1886, by joint resolution extended the time for the payment of the taxes of that fiscal year to January the 15th, 1887, and this extension having cut down the time between the falling due of the taxes and the time for the sale as provided in the original act, to wit, one month, the comptroller general extended the time of the sale to the first Monday in April, 1887, giving by this extension the two months and a half between the falling due of the taxes, as provided in the joint resolution above, and the sale as had been given in the original act. Under this extension the land in question was sold as delinquent lands on

the first Monday in April, 1887, and was purchased by the appellant, Copeland, who received a deed from the auditor. At the trial the appellant introduced this deed, and stood upon it, without more. No evidence whatever was introduced or offered by the respondents. The master found the deed invalid, and this finding was sustained by the Circuit Judge; hence this appeal.

The effect of a valid tax deed is to divest title and to transfer the land from the delinquent tax payer to the purchaser at the tax sale, and inasmuch as at such sales it became notorious that the amount paid by purchasers was uniformly trifling in comparison with the value of the property sold, it soon became an established principle and a settled rule in all the States, that in a contest over such sale the *onus* was upon the purchaser to prove affirmatively and rigidly every prerequisite required in the tax act, and so rigidly was this principle enforced by the courts everywhere, and so difficult was it for purchasers to comply with this rule, that it soon became proverbial, as was said in *O' Grady* v. *Barnhisel* (23 Cal., 287), "that a tax title was no title at all, and a sale for taxes was as near a mockery as any proceeding having the appearance of legal sanction could be." The difficulty in all such cases was to prove the existence of all the prerequisites, great and small, required by the acts and demanded by the courts, which in practice proved to be almost impossible. To relieve tax sales from this mockery, and to give some efficiency to the tax machinery by which the State is supplied with the means necessary to its existence. acts have been passed in many of the States abrogating the rigid rule referred to above, and giving a *prima facie* presumption of validity to tax deeds, and throwing the *onus* of showing invalidity upon the party assailing them. There is such an act in this State (*Gen. Stat.*, § 313), which provides as follows: "The conveyance of land sold at any delinquent land sale shall be *prima facie* evidence of title and shall create the presumption that every prerequisite of the law has been fully complied with, the burden of proof being in every instance upon the party impugning such conveyance."

Now, what is the true meaning of this section, and what effect is it to have upon tax sales in this State? Is it to be enforced or is it to be disregarded? While it is conceded, that in the absence

of any and of all statutory provisions to the contrary, it is a settled rule of law (as stated above) that upon a sale of land for delinquent taxes, neither a tax deed itself, nor any recitals contained therein, are evidence against the owner that the proceeding has been regular, and therefore in such case that the necessity of affirmative proof by the purchaser of all the legal prerequisites even to the minutest degree must be made, yet can it be said in the face of this section that this necessity still exists here? The language of the section is by no means ambiguous; on the contrary, it is plain, explicit, and direct. It provides in express terms: 1st, that the conveyance (the deed of the auditor) shall be *prima facie* evidence of title. 2nd. That it shall create the presumption that every prerequisite of the law has been complied with. 3rd. That the burden of proof in every instance is upon the party impugning such conveyance. In other words, that the purchaser has nothing to do but to throw down this deed, and there to rest until the assailing party shall show by evidence that some material prerequisite, some necessary preliminary step in the tax machinery, has not been complied with, and upon the failure to show this the deed must stand. This may or may not be a wise act, and no doubt under its operation valuable real estate may sometimes change hands for a mere song; but what has the court to do with that matter? The act is upon the statute book, it is the law of the State, and the citizens of the State have been invited thereby to attend tax sales, and to purchase property under its protection, and the courts cannot hesitate to enforce it on the ground of dangerous consequences. If it be a bad law, it should be repealed by that power authorized to repeal as well as to make laws, and, as was once said by a distinguished official of this country, "there is no easier way of having a bad law repealed than by rigidly enforcing it while it is the law."

Now, the pertinent question arises: Did the assailing parties below show by evidence in this case, affirmative or otherwise, that any prerequisite had been omitted by the officers charged with the tax duties in the sale in question? The *onus* to do this was clearly and absolutely upon them, or section 313 is even more than a mockery, it is a legislative fraud. No testimony was introduced by the respondents, not a word. It is clear, then,

that the assailants have not removed the *prima facie* presumption in favor of appellant by any affirmative evidence of their own. It is contended, however, that such evidence is found in the deed of the appellant in its recitals. Now, conceding that an assailing party may rely upon the recitals in the deed, this could only be effectual, not where the recitals fail to show a compliance in every particular, but only where they affirmatively show a noncompliance in one or more of the necessary prerequisites. In other words, the deed of the auditor is not bound to state in its recitals that each prerequisite step by step was taken and performed. It may state nothing in so far as the *prima facie* presumption is concerned in the first instance. But if it does contain recitals as to what was done, and these recitals show that certain prerequisites were omitted, and others not required were done in their stead, then it may be that the assailing party could rely on these recitals as the foundation of its attack.

This seems to have been the course in part adopted in the assault below. The master holding as matter of law that the sale should have been in March, 1887, as required by the act of 1885, *supra*, and finding as matter of fact, from the recitals in the deed, that said sale was not made until April, 1887, held that it thus appeared from said recitals that a material prerequisite as to the time of the sale had not been complied with, and consequently that the said sale was invalid. The Circuit Judge in brief terms affirmed this holding of the master. It was contended, however, on the part of the appellant, that the time of the sale had been extended by the comptroller general until the first Monday in April, and that said sale took place on that day in accordance with this extension, and after due advertisement, all of which also appeared in the recitals of the deed. The pivotal point of the case, then, as it seems to me, is, whether the comptroller had the right and power to extend the time of said sale. If he had such power, whether he exercised it in the precise mode prescribed by the act, to wit, with the approval of the governor, or not, is immaterial in so far as the *prima facie* presumption arising from the deed itself is concerned, because in the absence of evidence on the part of the respondent that the comptroller had failed to exercise this power correctly as to the manner and

form, the court must presume that he did, under the operation of section 313, General Statutes.

Did the comptroller have this power? Section 552, General Statutes, which is a section in the chapter prescribing the duties and powers of the comptroller, provides as follows: The comptroller general, with the approval of the governor, "may extend the time for the performance of the duties imposed upon the county officers, or for the assessment and *collection* of taxes, and when such assessment and collection is necessarily delayed, the comptroller general may postpone the time within which the penalties imposed by law would attach." This is a general law, which, as I understand it, overhangs all the special tax acts enacted for the several fiscal years, and gives authority to the comptroller general, with the approval of the governor, to extend the time of any of the duties imposed upon the tax officers at his discretion. It is a very important and useful power, and when discreetly used may greatly promote the general welfare. The deed of the appellant recites that the sale was made under this extension; there was no evidence from the assailant that it was not so made, nor that the extension was without the approval of the governor.

My conclusion is, that the Circuit Judge was in error in sustaining the holding of the master that the sale in question should have been made on the first Monday in March, 1887, as required by the original act, and in further holding that because it appeared in the recitals in the deed that said sale, instead of being then made, was actually made on first Monday in April, 1887, the presumption of validity was overthrown, and the deed was invalid. The irregularity referred to in the master's report, in reference to the statement in the deed that the first Monday in March was the 4th day instead of the 7th, is wholly immaterial, in view of the fact that the land was not sold under the act of 1885, but under the extension by the comptroller, and on the first Monday in April. The other irregularity relied on by the master is, that section 306, General Statutes, provides that where a portion only of the land has been purchased, as in this case, the purchaser when he comes to get his deed shall present to the auditor the receipt for the sum paid by him at the sale, and the certificate of sale and the survey and plot of the quantity pur-

chased, &c., and that those things did not appear in the recitals of the deed to have been done. Here the master has entirely misconstrued, as appears to me, section 313 of General Statutes, above, which throws the *onus* of proof upon the party impugning the deed, in the absence of which all the prerequisites are to be presumed. The law did not require the auditor to state in the deed that the matters mentioned had been performed, and his failing to do so furnished no evidence whatever that they had not been performed; section 313 presumed that they had been.

To briefly recapitulate : the deed of the appellant has been held invalid below on three grounds : First, because in the recitals it was stated that the first Monday in March was the 4th day, when it was the 7th. The answer to this is, that this mistake was wholly immaterial, in view of the fact that the sale did not take place in March at all, nor under the act of 1885, fixing the 1st Monday in March as the day for the sale ; but it took place in April, 1887, under the orders of the comptroller general, and after the required two weeks' notice. 2nd. Because it appeared in the recitals that the sale did not take place on the 1st Monday in March, 1887, but that it did take place in April, 1887, instead. This is true. This, however, was no violation of law, if the comptroller had the power to extend the time of sale, which we think he clearly had ; and inasmuch as it is stated in the recitals in the deed that he exercised this power, under section 313, *supra*, in the absence of all evidence to the contrary, it must be presumed that he exercised it correctly as to manner and form. 3rd. The deed is declared invalid because it does not appear in the recitals that a receipt for the sum paid by Copeland at the sale was presented, nor a certificate thereof, nor a survey and plot of the quantity of land purchased, &c. Neither did it appear in said recitals that these things were not done, nor was there any evidence offered by the respondents that they were not done. That they were done then, and properly done, is presumed under section 313, *supra*, or said section is a delusion and a snare.

Although in the ruling of the Circuit Judge it is said in general terms, that there were sufficient departures in this sale from the requirements of the act to render the deed of appellant invalid, yet these fatal departures have not been stated, except as

given in the master's report, to wit, the three above discussed. I think the judgment of the Circuit Court should be reversed as to the tax title involved, for the reason that the parties assailing it have entirely failed, as I understand the case, to show that any prerequisite required was omitted, and in the absence of such showing we have no alternative under section 313 but to presume that all were observed. In an elaborate note to *Jackson* v. *Shepard* (17 Am. Dec., 505), will be found many cases from different States bearing upon and sustaining the views hereinabove. It may be observed that the appellant, at the time of the purchase, had a large claim in judgment against Duncan, and that his purchase was the only way in which he could secure any portion of his claim. But this really has nothing to do with the legal questions involved.

As to the matters of dower and homestead, I concur with Mr. Justice McIver in his separate opinion, and for the reasons so fully therein stated, and I concur in the judgment prepared by him, to wit, that the judgment of the Circuit Court, in so far as it declares the tax title invalid, and in so far as it allows the claim of homestead, be reversed, and that as to the question of dower the case be remanded to the Circuit Court for the purpose of determining these questions of fact: 1st. Whether the demandant was the wife of testator at and before the lien for taxes arose; and 2nd. Whether she was his wife at the time of the act giving a lien for taxes was originally adopted; and if these questions be affirmatively answered, then that judgment be rendered in favor of the claim of dower.

And it is the judgment of this court that the judgment of the Circuit Court, in so far as it declares the tax title of J. W. Copeland invalid, and in so far as it allows the claim of homestead to the widow of Duncan, deceased, be reversed, and that as to the questions of dower the case be remanded to the Circuit Court for the purpose of determining these questions of fact: 1st. Whether the demandant was the wife of the testator at and before the lien for taxes arose; and 2nd. Whether she was his wife at the time the act giving a lien for the taxes was originally adopted; and if these questions be affirmatively answered, then that judgment be rendered in favor of the claim of dower.

MR. JUSTICE McIVER.  As to the first question, relating to the validity of the tax title set up by the appellant, I concur in the conclusion reached by the Chief Justice.  It seems to me clear that, under the provisions of section 313 of General Statutes, when appellant produced his deed, a copy of which is set out in the "Case," it was sufficient to establish his title, until it was shown, either by evidence *aliunde* or from the terms of the deed itself, that one or more of the prerequisites of the law regulating tax sales had not been complied with ; for that section explicitly declares that "the conveyance of land sold at any delinquent land sale, shall be *prima facie* evidence of title, and shall create the presumption that every prerequisite of the law has been fully complied with, the burden of proof being in every instance upon the party impugning such conveyance."

All, therefore, that the appellant had to do, in order to establish his claim, was to show that the land in question was sold at a delinquent land sale, and that he held a conveyance for the same ; and that this was done is conclusively shown by the master's second finding of fact, which is confirmed by the Circuit Judge, and to which no exception has been taken.  That finding of fact is in these words : "That the taxes for the fiscal year beginning November 1st, 1885, not having been paid on said lands, the treasurer for said county exposed the same for sale on 4th April, 1887, when James W. Copeland, offering to pay said taxes and the penalty thereon for twelve hundred acres of the land, the auditor for the county gave to him a certificate of purchase for said twelve hundred acres, and on the 10th of May, 1888, executed and delivered to said Copeland a deed therefor, upon the presentation by him of the said certificate of purchase." The appellant having thus established his claim *prima facie*, the statute expressly requires that those who seek to impugn his conveyance must assume the burden of proof to show that some essential prerequisite has not been complied with, and until they do this, the court is bound to assume "that *every* prerequisite of the law has been *fully* complied with," and the assailing party must "in *every* instance" assume the burden of rebutting this presumption.

So that the practical inquiry in this case is, whether this pre-

sumption in favor of the conveyance has been rebutted by proof that some one or more essential prerequisites have not been complied with. This may be done either by evidence *aliunde*, or by the terms of the conveyance itself (*Cooke* v. *Pennington*, 15 S. C., 185); in which case, the deed upon its face showing that the land was sold two days before the time advertised for the sale, it was held that this recital in the deed was sufficient to rebut the presumption. In the case now under consideration, no evidence *aliunde* being offered, we must look alone to the terms of the deed itself in order to ascertain whether any essential prerequisite has not been complied with; but in doing this, we must bear in mind the fact, that the omission to recite that a given prerequisite has been complied with, is not sufficient, but the recitals must show affirmatively that some prerequisite has not been complied with. This follows, necessarily, from the express terms of the statute, which declares that the conveyance "shall create the presumption that every prerequisite of the law has been fully complied with," and throws the burden of proof "in every instance" upon the party who undertakes to impugn the deed. The inquiry, then, is narrowed down to the question, not whether the recitals in this conveyance show that any or all of the "prerequisites of the law" have been fully complied with, for that, the statute declares, shall be presumed from the conveyance, but whether the recitals in this conveyance show that some essential prerequisite has *not* been fully complied with.

First, it is urged that the deed shows on its face that the sale was made on the fourth day of April, 1887, whereas the law provides that it should have been made on the first Monday in March, 1887. It is true that the deed does show that the sale was made on the 4th of April, and it is equally true that by the 12th section of the act of 1885 (19 *Stat.*, 268), imposing these taxes, it was provided that the delinquent land sale should be held on the 1st Monday in March, 1887, and if nothing else appeared in the case, there can be no doubt that the conveyance showing affirmatively a failure to comply with an essential requirement, the sale would be void. *Roddy* v. *Purdy* (10 S. C., 137), recognized and followed in *Dougherty* v. *Crawford*, 14 *Id.*, 628. It appears, however, that the general assembly, by a joint resolution, adopted

23rd December, 1886 (19 *Stat.*, 746), extended the time fixed by the act of 1885 for the payment of taxes to the 15th of January, 1887—just one month—and that the comptroller general extended the time for the sale of delinquent lands for the same period; and the real question is, whether that officer had any authority to make such extension.

Section 552 of the Gen. Stat.: "The comptroller general, with the approval of the governor, may extend the time for the performance of the duties imposed upon the county officers, or for the assessment and collection of taxes; and when such assessment and collection of taxes are necessarily delayed, the comptroller general may postpone the time within which the penalties imposed by law would attach." It seems to me, that, under the provisions of this section, the comptroller general, with the approval of the governor, may, *first,* "extend the time for the performance of the duties imposed upon the county officers," in relation to the assessment and collection of taxes, "or," *second,* extend the time "for the assessment and collection of taxes," and, *third,* "where such assessment and collection of taxes are necessarily delayed, the comptroller general may postpone the time within which the penalties imposed by law would attach." The first two may be done by the comptroller general only "with the approval of the governor," while the third, it would seem, may be done without such approval.

Now, as one of the duties imposed upon the county officers, charged with the assessment and collection of taxes, unquestionably is to sell delinquent lands at the time specified by statute, it seems to me to follow necessarily that the comptroller general, with the approval of the governor, may extend the time for the performance of this duty; and the recitals in the conveyance in question show that he did thus extend the time for the sale, and that the sale was made at the time fixed by such extension. It is true that these recitals do not show that such extension was made by the comptroller general, "with the approval of the governor," but, what is more to the point, it is equally true that such recitals do not show that he acted without the approval of the governor, and besides the general presumption, that in the absence of evidence to the contrary, a public officer has done h's duty, we are

37—31

bound by the express terms of section 313, above quoted, to presume that "*every* prerequisite of the law has been *fully* complied with," and therefore to presume that such extension by the comptroller general was made with the approval of the governor.

The fact that the deed recites that the first Monday in March fell on the 4th instead of the 7th of that month, becomes wholly immaterial, in view of the fact that the sale was not made in March, the time fixed originally by statute, but in April, at the time as extended by the comptroller general. So, also, as to the recital of the ninety-one days, which becomes wholly immaterial in view of the fact, shown plainly on the face of the deed, that it was not executed until more than a year and a day after the sale; the sale having been made on the 4th of April, 1887, and the deed not having been executed until 10th of May, 1888, as shown by its date, as well as found as matter of fact by the master. It, therefore, becomes unnecessary to inquire whether the deed could have been properly executed after the lapse of ninety-one days, or whether it could only have been executed after the lapse of a year and a day—a question which seems to have been left in some obscurity by the apparently conflicting terms of sections 297 and 306 of the General Statutes.

All the other objections to the tax title are negative in their character, that is to say, rest upon the allegation that certain prerequisites do not appear, from the terms of the deed, to have been complied with; but, as we have seen, objections of this character cannot avail, for they are overcome by the presumption declared by section 313 in favor of the deed.

The second question presented by the appeal, whether the widow is entitled to dower and homestead, either or both, notwithstanding the validity of the tax title, appears to me to be one of much more difficulty, at least so far as the claim of dower is concerned. As to the claim of homestead, it seems to me clear, that under the express provisions of the constitution, as well as of the acts of the general assembly passed in pursuance thereof, that the claim of homestead is subordinated to the payment of taxes, and hence, whenever land is sold for taxes, the purchaser takes title free from the claim of homestead.

It only remains, therefore, to consider the question, whether

the widow's claim of dower has been barred or defeated by the sale of the land, out of which dower is claimed, for taxes. As I understand it, the taxes for which the land was sold were those imposed for the fiscal year beginning 1st November, 1885, and under the provisions of sec. 170 of the General Statutes became a lien on the land at that date. It appears that Duncan, the testator, died some time in the year 1886, after the lien for taxes had attached, but before the sale took place. Whether the demandant was the wife of testator on the 1st of November, 1885, does not appear in the "Case," inasmuch as, under the view taken both by the master and the Circuit Judge, it was immaterial to inquire; but as there is every probability that such was the fact, I shall, in this discussion, assume it to be so, though, of course, according to my view, it would be necessary to send the case back for the determination of that question of fact, before any final determination of the widow's right to dower could properly be reached. Assuming, then, that the demandant was the wife of the testator at and before the time when the lien for taxes was fixed upon the land, and, therefore, that her inchoate right of dower had attached to the land before the lien for taxes arose, the question to be determined is, whether the right of dower has been defeated by a sale under such lien after such inchoate right had become consummate and vested by the death of the husband.

So far as I am informed, we have no case in this State deciding this question. We have several cases which decide that a sale of land under a lien fixed upon it *befcre* marriage, and therefore *before* the inchoate right of dower has attached, will defeat the widow's claim of dower (*Crafts* v. *Crafts*, 2 McCord, 54; *Mey* v. *Mey*, Rich. Eq. Cases, 378; *Jones* v. *Miller*, 17 S. C., 380; *Shiell* v. *Sloan*, 22 *Id.*, 151; *Brown* v. *Cave*, 23 *Id.*, 251); but in all of these cases the lien had been fixed upon the land before the inchoate right of dower had attached; and, so far as I can discover, there is nothing said in any of these cases which would warrant the idea that the right of dower would be defeated where the lien arose after the inchoate right of dower had attached. On the contrary, the intimation in some of those cases is very strong, that a lien subsequently arising is subordinate to the inchoate right of dower which has previously attached; and this, it

seems to me, upon well settled general principles, is the correct view.

But, it may be said, conceding this to be so, yet the legislature has expressly declared, by section 170 of General Statutes, that taxes "shall be a first lien in all cases whatsoever upon the property taxed," and hence, it is argued, that the lien for taxes overrides the lien or encumbrance, as it is called, arising from the wife's inchoate right of dower. Whether the inchoate right of dower can properly be regarded either as a lien or encumbrance, will be hereinafter considered, as it is proposed first to examine the terms of section 170, which is in these words: "All taxes, assessments, and penalties legally assessed shall be considered and held as a debt, payable to the State by a party against whom the same shall be charged; and such taxes, assessments, and penalties shall be first lien in all cases whatsoever upon the property taxed; the lien to attach at the beginning of the fiscal year during which the tax is levied; and such taxes shall be first paid out of the assets of any estates of deceased persons, or held in trust as assignee or trustee as aforesaid, or proceeds of any property held on execution or attachment; and the county treasurer may enforce the said lien by execution against the said property; or if he cannot levy thereon, he may proceed by action at law against the person holding said property. When any real estate shall be sold under any writ, order, or proceeding in any court, the court shall, on motion of any person interested in the real estate, or in the purchase or proceeds of the sale thereof, order all taxes, assessments, and penalties charged thereon, to be paid out of the proceeds of such sale, as a lien prior to all others."

Upon this section two questions arise: 1st. Whether the legislature intended to give the lien for taxes priority over the inchoate right of dower which had previously attached. 2nd. If so, whether the legislature had the power, under the provisions of the constitution, to subordinate this previously existing right to a lien subsequently created. As to the first question, it will be observed that the legislature, after declaring that taxes shall be considered a debt to the State, proceeds to declare that such debt shall be a first lien on the property taxed, which would seem to imply that the idea in the legislative mind, in using the term lien, was that

of a security for the payment of a debt, and that the language used in the section is to be construed as meaning that the lien thereby created, to secure the payment of this debt to the State, should have priority over every other lien designed to secure the payment of any other debt. If this be the proper construction of the language used in the section, then it is quite certain that the inchoate right of dower is not included; for such right can, in no sense, be regarded as a debt secured by a lien.

If, however, this be not the proper construction, then it becomes necessary to consider the question passed over above, whether the inchoate right of dower can properly be regarded as a lien, in the sense of that term, as used in section 170. In 2 *Scribner on Dower*, 5, will be found the following language: "It is difficult to state with precision the nature or qualities of inchoate dower interest when considered as a right of property. A certain vagueness of expression uniformly characterizes the discussions of the subject, and these discussions are commonly attended with unsatisfactory results"; and after considering the cases in which the nature and qualities of this right have been discussed, the author concludes in these words: "Although, therefore, an inchoate right of dower cannot be properly denominated an estate in lands, nor, indeed, a vested interest therein, and notwithstanding the difficulty of defining with accuracy the precise legal qualities of the interest, it may, nevertheless, be fairly deduced from the authorities that it is a substantial right, possessing, in contemplation of law, the attributes of property, and to be estimated and valued as such." The inchoate right of dower has been treated as such a substantial right of property as will afford a basis for an action to protect it. *Simar* v. *Canaday*, 53 N. Y., 298, s. c. 13 Am. Rep., 523; *Buzick* v. *Buzick*, 44 Iowa, 259, s. c. 24 Am. Rep., 740. Its present value may be judicially ascertained and protected. *Gordon* v. *Tweedy*, 74 Ala., 232, s. c. 49 Am. Rep., 813. And in our own State it has been held, in the case of *Prescott* v. *Hubbell*, not reported, but referred to in *Banks* v. *Brown*, 2 Hill. Ch., at page 564, that the renunciation of a wife's inchoate right of dower is a sufficient consideration to support an apparently voluntary deed from the husband for the use of his wife as against his creditors. But I have not

been able to find a single case in which the inchoate right of dower has been treated as a lien in the proper sense of that term.

These authorities, it seems to me, point unmistakably to the conclusion, that the inchoate right of dower is a substantial right of the property and not a lien, and, as is said by Mr. Justice McGowan in *Pegues* v. *Warley* (14 S. C., at page 190), the distinction between the two rights of dower and property is plain and must be observed. One conveys the idea of an interest in the property itself, while the other only conveys the idea of the power to sell such property. As is said in *Park on Dower*, 237, quoted with approval in *Cunningham* v. *Shannon* (4 Rich. Eq., at page 140), the inchoate right of dower is "a right attaching by implication of law; which, although it may possibly never be called into effect (as where the wife dies in the life-time of the husband), yet, from the moment that the fact of marriage and of seizin have concurred, is so fixed on the land as to become a title paramount to that of any other person claiming under the husband by a subsequent act." After this right has once attached, it is held by the wife entirely independent of the husband, and it cannot be affected by any act or omission on his part. *Tibbetts* v. *Langley Manuf. Co.*, 12 S. C., 465; *Sondley* v. *Caldwell*, 28 *Id.*, 580.

It is true that we have several cases in this State which speak of the inchoate right of dower being an encumbrance (*Polk* v. *Sumter*, 2 Strob., 81; *Lamar* v. *Scott*, 4 Rich., 516; *Jeter* v. *Glenn*, 9 *Id.*, 374; *Lessly* v. *Bowie*, 27 S. C., 193); but an examination of those cases will show that the term "encumbrance" is not used in the sense of a "lien," but rather in the sense of an outstanding paramount title, which operates as a breach of the covenant of seizin. See the definition of an encumbrance by Chief Justice Parker in *Prescott* v. *Trueman* (11 Mass., 629), quoted with approval in *Polk* v. *Sumter, supra*, as well as the case of *Jones* v. *Gardner* (10 Johns., 266), also cited in that case, in which the court speaks of the inchoate right of dower as the wife's contingent life estate in one-third part of the land. But I do not find any case in which the inchoate right of dower is spoken of as a lien. On the contrary, the case of *Bauskett* v. *Smith* (2 Rich., 164), recognized and followed by this court, as

at present organized, in the case of *Williamson* v. *Gasque* (24 S. C., 100), would seem to be inconsistent with the idea that the inchoate right of dower is, in any proper sense of that term, a lien.

But in addition to this, we find in another section (§ 283), in the same chapter of the General Statutes which contains section 170, a provision in these words: "That at all sales of land for taxes, only the right, title, and interest of the one in whose name the land has been listed and assessed shall be sold." With a further proviso in these words: "That nothing herein contained shall prevent the priority of the lien for taxes over any encumbrance created by or against the owner of the property listed for taxation." Now, as this land was assessed for taxes in the name of the husband, it is clear that nothing but his right, title, and interest therein could be sold for the taxes thus assessed; but as the broad terms used in the first proviso might leave it at least doubtful whether the purchaser at the sale for taxes, having bought only the interest of the delinquent taxpayer, which interest would be subject to any liens that might have been previously fixed upon the land, would not take his title subject to any previous lien, the second proviso was added, declaring "that nothing herein contained shall prevent the priority of the lien for taxes over any encumbrance *created by or against the owner* of the property listed for taxation"; for the manifest purpose of enabling the purchaser to obtain a title for all the right, title, and interest of the former owner free from any lien which may have been previously fixed upon the property, either by the owner himself or by operation of law.

Now, what is the right, title, and interest which a married man has in land of which he is seized during coverture? It certainly is not such an absolute, unqualified interest as would enable him to alienate it, free from the claim of dower, either by deed or devise, but his alienation is always subject to the wife's right of dower, which can only be released or extinguished by her own act. Nothing that the husband may do can in any way affect it. From this, it follows that when the right, title, and interest of the husband is sold, either directly by himself or through the medium of an officer of the law, the purchaser takes no more than what

was sold—the right, title, and interest of the husband, which does not include the dower interest—and hence the purchaser must take his title subject to the wife's right of dower.

My conclusion, therefore, is, that the legislature never intended to give the lien for taxes priority over the inchoate right of dower which had attached before such lien arose, but only intended to give the lien for taxes priority over all other liens, to secure the payment of any debt created by or against the defaulting tax-payer. Taxes having been declared, by the section under consideration, to be "a debt payable to the State," it was but natural that, in analogy to the provisions of the statute, giving a preference to debts due the public, in prescribing the order for the payment of debts due by an insolvent estate, a similar preference should be given to the lien for taxes over all other liens, to secure the payment of any other debts: and such I believe to be the true intent and meaning of section 170 of the General Statutes.

But if I should be in error in this, there would still remain the further question, whether the legislature, under the provisions of the constitution, has the power to give the lien for taxes priority over the inchoate right of dower which had attached before such lien had been created. If the inchoate right of dower is to be regarded as a substantial right of property arising out of contract, then it would seem to follow that, under the contract clause of the constitution forbidding any legislation which impairs the obligation of a contract, the legislature would have no such power. While we have no authority in this State, so far as I know, upon this question, it must be confessed that the decided weight of authority elsewhere seems to be in favor of the view, that though marriage is regarded in law simply as a civil contract, and though that relation is a condition precedent to the creation of the right of dower, yet the right of dower does not proceed from or rest upon the marital contract, but is conferred by positive act of law (2 *Scrib. Dower*, 1–3, and the cases there cited); and hence it has been held in many cases, and the doctrine has been adopted by eminent text-writers, that what the law creates it may also destroy, and, consequently, that the legislature has full power to enlarge, abridge, or entirely take away the inchoate right of dower. See *Cooley Cons. Lim.*, 361; 5 *Am. & Eng. Encycl.*

*Law*, 904, and the cases cited in 2 *Scrib. Dow.*, 9–21, though that author seems to think that such legislation can only operate prospectively. See, also, *Randall* v. *Kreiger*, 23 Wall., 137. But as, under the view which I take of the proper construction of section 170, this question cannot arise, I do not propose to consider it further, but will reserve my opinion until a case is presented in which the question properly arises.

I think, therefore, that the judgment of the Circuit Court, in so far as it declares the tax title invalid, and in so far as it allows the claim of homestead, should be reversed, and that as to the question of dower, the case be remanded to the Circuit Court for the purpose of determining these questions of fact: 1st. Whether the demandant was the wife of the testator at and before the lien for taxes arose; and, 2nd. Whether she was his wife at the time the act giving a lien for taxes was originally adopted; and if these questions be affirmatively answered, then that judgment be rendered in favor of the claim for dower.

Mr. Justice McGowan. [Omitting his statement, hereinabove given in full.] First. As to the validity or invalidity of the tax title. We agree with the Circuit Judge, that it would be difficult to add anything to the "able report" of the master upon that subject. There was no testimony in the case, except the evidence which the recitals of the deed itself afforded, and an attempt to reargue the irregularities would necessarily be nothing more than a repetition of what is contained in the report. It is insisted that the recital of irregularity is unimportant, and not an "essential or substantive part of the deed," and therefore should not invalidate it. The objection may appear somewhat technical, but it must not be overlooked that the subject matter itself is purely statutory, and that it is regarded as a wise and just policy to scrutinize with great strictness tax sales, which generally are for very inadequate consideration, "the rule being cents for acres." It seems to me that there is nothing unreasonable in requiring a formal, punctilious, and strict compliance with all requirements of the law, when the deed of a public officer, having no interest in the land, purports to convey 1,200 acres, belonging to an insolvent estate, for $113.77 of taxes.

As I understand it, the rule was clearly stated by Mr. Justice McLean in *Ronkendorff* v. *Taylor's Lessee* (4 Peters, 349): "In an *ex parte* proceeding, as a sale of land for taxes under a special authority, great strictness is required. To divest an individual of his property against his consent, every substantial requisite of the law must be complied with. No presumption can be raised in behalf of a collector who sells real estate for taxes to cure any radical defect in his proceedings; and the proof of regularity devolves upon the person who claims under the collector's sale." Or, as it is stated by Mr. Blackwell "On Tax Titles," marginal, p. 66: "The party claiming under the power [to sell lands for taxes] is chargeable with notice of every irregularity in the proceedings of the officers. He purchases at his peril, the maxim *caveat emptor* being rigidly applied to him. The reasons are obvious. The law imputes to every purchaser knowledge of all facts appearing at the time of his purchase upon the muniments of title, which it was necessary for him to inspect in order to ascertain the sufficiency of it. More especially is this doctrine applicable to the purchaser at a tax sale. For, knowing the land to have been sold under color of an authority given by law to a public officer, who is not the proprietor thereof, he is bound to inquire and take notice whether that officer, and all others whose agency is required by the law in the conduct of the proceedings, have proceeded with regularity in the discharge of their duty," &c.

In the light of these principles, was there any "substantial defect" in this sale? In the sale of land for taxes, it is fundamental that, unless the officer has the authority to sell, the sale is void. He sells professedly under a naked power, and if there is no such power to sell at the time and place named, then, although it may be in form "a delinquent land sale," it is in reality not such. The act authorizing a sale for the taxes of the year in question required that it should be made on sales-day of March, 1887. That certainly was not done. On the contrary, the sale was not made until April 4, 1887, which was clearly fatal under the positive provision of the act that lands delinquent under the assessment made by that act, "shall be offered for sale on the first Monday in March, 1887." *Ita lex scripta est.*

But it is insisted that the comptroller general had extended

the time for the collection of taxes, and with it delinquent land sales, under section 552 of the General Statutes, which provides as follows : "The comptroller general, with the approval of the governor, may extend the time for the performance of the duties imposed upon the county officers or for the assessment and collection of taxes ; and when such assessment and collection are necessarily delayed, the comptroller general may postpone the time within which the penalties imposed by law would attach,". &c. Whether this provision gave the comptroller general the right to postpone the time of the sale previously fixed, was a question of law, depending upon the proper construction of the act itself, which, of course, was to be shown affirmatively by him who affirmed the regularity of the sale.   The provision makes no express reference to "delinquent land sales," but if by a liberal construction we regard such cases as included under the head of "assessment and collection of taxes," then the question was, could the comptroller general of his own head and without "the approval of the governor" legally make such postponement? Without going into the argument, it seems to me clear that he could not ; that the power to postpone such a sale was given only "with the approval of the governor;" and such approval not appearing, the sale made on April 4, 1887, was without authority of law and void, just as if no power to postpone had ever been given to the comptroller general.   An essential element to give the power was lacking. *Roddy* v. *Purdy*, 10 S. C., 137 ; *Dougherty* v. *Crawford*, 14 *Id.*, 628.

It is, however, suggested that after the person, Copeland, who bid off the land for the taxes, had obtained the deed of the auditor, said deed must be taken to afford the proof by presumption that the governor as an officer did his duty, and actually, as a fact, gave his "approval" to the change of the time of the sale, by the authority of section 313 of the General Statutes, which provides that "the lien of any land let, at a delinquent land letting, and the conveyance of land sold at any delinquent land sale, shall be *prima facie* evidence of title, and shall create the presumption that every prerequisite of the law has been fully complied with, the burden of proof being in every instance upon the party impugning such lien or conveyance," &c.   The force and

effect of this provision was somewhat considered in the case of *Cooke* v. *Pennington* (15 S. C., 193), where it was held that "he who claims title under a tax deed must prove it," and that the above section did not apply or the *prima facies* arise, until it appeared that there was "a delinquent land sale." The words are, "the conveyance of land sold at any delinquent land sale," &c., which cannot reasonably be construed any sale that may be called "a delinquent land sale," but one which is in reality such.

Now, there are certain things absolutely necessary to constitute a delinquent land sale, and among them, first and foremost, is the power of the officer to sell on the day named. Without that, there is not and cannot be a delinquent land sale; and it follows that whatever is necessary to give that power, must exist at the time of the sale. Surely the deed, which is only a result of the sale, cannot by presumptions show retrospectively authority in the officer to make the sale. As it strikes me, that would be wholly reversing the order of things. Instead of first proving that the officer had the right to sell on the day, or in other words, that it was "a delinquent land sale," and in that way raising the presumption of the act, it would be first exhibiting the deed to show by the presumptions allowed by it, that the officer had the authority to sell at the time, and therefore it was "a delinquent land sale." If this was so, it would only be necessary to obtain the deed of an auditor (whether he had or had not the power to make the sale), and then exhibit the deed as affording the presumptions that the whole proceeding was regular and the title perfect. I cannot believe that such was the intention of the provision, but that in all cases it must first appear that the officer had the power to sell on the day named, outside of and independent of any presumption afforded by the existence of the deed. The presumptions are raised to cure mere irregularities in "a delinquent land sale," not to prove the essentials which make it such.

As was said in *Cooke* v. *Pennington*, 15 S. C., 192: "The deed must be of land 'sold at delinquent land sale.' The fact that it was so sold cannot be assumed from the existence of the deed itself, but must appear before the law can apply or the party have the benefit of the presumptions. It would be intolerable if a bare deed purporting to be given by an auditor, conveying

the land of one man to another, could not be shown by its own terms to have no connection with a delinquent land sale, but, on the contrary, to have been executed without proper authority." The land was not sold on that day appointed by law. The appellant failed to show, by recitals in his deed or otherwise, that the time of sale was changed "with the approval of the governor." That was a "substantial defect," going to the very power of the officer to make the sale on that day, and showing that, though it might be in form, it was not in law, "a delinquent land sale." This defect being "radical," could not, in the language of Mr. Justice McLean, "be cured by presumptions raised in behalf of the collector." All the authorities agree that "if the validity of a deed depends upon an act *in pais*, the party claiming under that deed is as much bound to prove the performance of that act, as he would be to prove any matter of record on which its validity might depend. It forms a part of his title; it is a link in the chain which is essential to its continuity, and which it is incumbent on him to prove. It is easy for the purchaser to prove these facts. In many cases the negative would not admit of proof. The existence of these acts *in pais* is not to be made out by intendment; they must be proved. It is not a case for presuming that public officers have done their duty, but what they have done must be shown," &c. *Black. Tax Titles,* *72. And see *Clark* v. *Graham*, 6 Wheat., 577, and notes.

I agree with the master and Circuit Judge that the tax deed has on its face evidence of a departure from the strict and rigid requirements of the law necessary to sustain a proceeding which divests the citizen of his freehold; and that in consequence the sale was void.

Second. But if in this I am in error, and the deed of the auditor, under the circumstances of the sale, carried good title to the purchaser, then the question arises, whether that conveyance bars the right of the widow Elliott to homestead and dower in the premises covered by it. If I understand it, the theory is, that the land was the consideration of the taxes, and assuming it to have been sold in their payment, it seems to me that the widow has no right to homestead, as the constitution which gives the homestead right declares "that no property shall be exempt

from attachment, levy, and sale for taxes," &c.   But the right
to dower is a different thing, and depends upon very different
principles.   It is a common law right, and although it arises out
of the husband's estate, it is yet separate and distinct, being de-
fined as "a right attaching in law, which although it may possi-
bly never become absolute (as if the wife die in the life-time of
the husband), yet from the moment that the facts of marriage
and seizin concur, is so fixed on the land as to become a title
paramount to that of any person claiming under the husband by
subsequent act.   The alienation of the husband, therefore,
whether voluntary as by will or deed, or involuntary as by
bankruptcy or otherwise, will confer no title on the alienee as
against the wife in respect of her dower; but she will be entitled
to recover against such alienee in the same manner as she would
have recovered against the heir of the husband, had the latter
died seized," &c.   Scrib. Dower, chap. XXIX., and section 1.

From this well considered description or definition of dower,
it would seem that the question, whether the conveyance of the
officer at a delinquent land sale for taxes is paramount or subject
to the dower right of the widow of the defaulting tax-payer, must
depend upon the inquiry, whether the purchaser's title is original
or derivative; that is to say, whether upon default of paying the
taxes the land is eo instanti forfeited, and a new and independent
title, direct from the State, issues to the purchaser, severing all
connection with the former owner; or his title is derived through
certain legal notices and special proceedings, from or under the
former owner, whose default alone caused the sale, and whose
interest alone is sold, as under an ordinary judgment for debt
against him.   A respectable authority states the matter thus:
"In those States where the tax is a charge upon the land alone,
where no resort in any event is contemplated against the owner
or his personal estate, and where the proceeding is strictly in
rem, the tax deed will undoubtedly have the effect to destroy all
prior interests in the estate, whether vested or contingent, &c.
In such case the tax law itself is notice to the whole world of the
liability of the land for all public assessments, &c.   If one neg-
lects his duty in this respect, his title becomes extinct, and a new
and independent title becomes vested in the purchaser, freed

from all prior encumbrances, and, indeed, of every interest carved out of the old fee. On the other hand, where the law requires the land to be listed in the name of the owner, provides for a personal demand of the tax, and in case of default authorizes the seizure of the body or goods of the delinquent, in satisfaction of the tax, and in terms, or upon a fair construction of the law, permits a sale of the land only when all other remedies have been exhausted : then the sale and conveyance of the officer passes only the interest of him in whose name it was listed—upon whom the demand was made—who had notice of the proceedings, and who alone can be regarded as legally delinquent. In such case the title is a derivative one, and the tax purchaser can recover only such interest as he may prove to have been vested in the defaulter at the time of the assessment," &c. See *Black. Tax Titles* (4th edit.), *548.

Now, I think it manifest, according to this classification, that the tax laws of our State place us in the category of States in which there are prescribed certain proceedings for the assessment and collection of taxes, reaching up to the sale, and connecting with the former owner named as the party in default, and whose interest alone is transferred by the deed of the officer. Indeed, section 283 of the General Statutes, cited in the opinion of Mr. Justice McIver, expressly declares, "that at all sales of land for taxes only the right, title, and interest of the one in whose name the land has been listed and assessed shall be sold." I confess it is difficult to understand how the purchaser at a delinquent land sale can take a new and independent title, except in the view that upon default in the payment of the tax the land is immediately forfeited to the State, and then sold by its officer somewhat like escheated property. The law does not favor forfeitures, and surely there can be no good reason why default of the husband in paying his tax, should work a forfeiture of the interest of the wife, which is distinct from that of the husband, and who is innocent of all fault. In the old case of *Mongin and wife* v. *Baker & Stevens* (1 Bay, 73, in 1789, soon after the Revolution), it was said that "the court will never give so harsh a construction to the confiscation act as to deprive a person of a common law right, and therefore the widow of a person placed

on the confiscation list is entitled to her dower." In the case of *Wells* v. *Martin* (2 Bay, 20, 1796), it was held that the widow of a man who was banished from the State, and whose estate was confiscated by the act of 1782, for adhering to the British in the course of the revolutionary war, was notwithstanding entitled to her dower in all his lands, &c., the court saying "that the right of dower was a common law right which the widow was entitled to, and which was in no wise impeached by the confiscation act."

In the view that the sale was a binding delinquent land sale, as my brethren think, I concur that the deed of the auditor was paramount to the claim of homestead, but subject to that of dower on the part of the widow of the defaulting tax-payer.

Judgment reversed.