Doris Kay DEVERS, Appellee,

v.

CHATEAU CORPORATION, C.F. Prospect, Inc., Co-partners d/b/a Prospect House Associates; Prospect House Unit Homeowners Association; John Does One (1) through Three Hundred (300); Lots Numbered One (1) to Sixty-Two (62), (except Lots 34 and ½ of 35) Inclusive, in Block Numbered Seven (7); and Lots Eighteen (18) to Twenty-Six (26), Inclusive, in Block Number Eight (8) Radnor Heights Subdivision, as the same appears duly dedicated, platted and recorded among the land records of Arlington County, Virginia, in Deed Book 110, at Page 576; Theodore A. Adams; Jeanie M. Adams; Unified Industries; Elizabeth Tulos, Appellants,

v.

John DALONAS, Third-Party Defendant.

Doris Kay DEVERS, Appellant,

v.

CHATEAU CORPORATION, C.F. Prospect, Inc., Co-partners d/b/a Prospect House Associates; Prospect House Unit Homeowners Association; John Does One (1) through Three Hundred (300); Lots Numbered One (1) to Sixty-Two (62), (except Lots 34 and ½ of 35), Inclusive, in Block Numbered Seven (7); and Lots Eighteen (18) to Twenty-Six (26), Inclusive, in Block Number Eight (8) Radnor Heights Subdivision, as the same appears duly dedicated, platted and recorded among the land records of Arlington County, Virginia, in Deed Book 110, at Page 576; Theodore A. Adams; Jeanie M. Adams; Unified Industries, Appellees,

v.

John DALONAS, Third-Party Defendant.

Nos. 85–1715(L), 85–1716.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1986.

Decided June 17, 1986.

Rehearing and Rehearing En Banc Denied Sept. 8, 1986.

Samuel W. Hixon, III, Richmond, Va. (Channing J. Martin; Williams, Mullen & Christian, P.C., Richmond, Va., David G. Fiske, John P. Corrado, Thomas & Fiske, P.C., Alexandria, Va., on brief), for appellants Chateau Corp. and C.F. Prospect, Inc.

Peter K. Stackhouse, Tolbert, Smith, Fitzgerald & Ramsey, Arlington, Va., on brief for appellants Theodore A. Adams, Jeanie M. Adams and Unified Industries.

Jeffrey Rosenfeld and James G. Smalley (Falcone & Rosenfeld, Ltd., Fairfax, Va., Gwendolyn S. Whipp, Fairfax, Va., Patricia A. Smith, Donald G. Ferrell, on brief), for appellee Doris Kay Devers.

Before MURNAGHAN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

WILKINSON, Circuit Judge:

This case involves one scoundrel and several innocent parties. The scoundrel, Malcolm Devers, conveyed his substantial interest in a property without the knowledge or consent of his wife, and with the intent to deceive the purchasers as to his marital status. The question, as it often is in commercial conveyances, is how to do justice among the innocents. Here, that path lies in assessing as accurately as possible the value of that to which the wife's admitted dower rights attach and the true nature of what Malcolm Devers held during coverture.

Doris Devers brought this action for assignment of her dower rights in a piece of property known as Radnor Heights against Chateau Corporation, C.F. Prospect, Inc., and the individual owners of apartments built on the land (hereinafter "Chateau"). The district court found that the greatest interest held by Malcolm Devers during his marriage to Doris was a fee simple subject to a 99-year lease. We agree with that characterization of Doris Devers' dower interest. The second question raised by the lawsuit concerns the value of the reversion at the end of that lease, in 2062. The district court valued the reversionary interest in 1974 at $8,000,000. We believe this figure substantially overstates the worth of the long-term reversionary interest in the property, and we reverse that portion of the judgment of the district court.

### I.

Malcolm Devers owned a piece of real estate in Arlington County, Virginia, known as Radnor Heights. In 1962, Devers leased the property for 99 years to Congressional Apartments, Inc. for $5,000 a month. Congressional Apartments assigned the lease to Lawrence Brandt and Donald Brown, who built an apartment building on the land. Devers retained a reversionary interest in both the land and the apartment building.

In 1963, Malcolm married Doris. In 1971, he conveyed the Radnor Heights property to Devers Properties, Inc., a Virginia corporation in which he was the sole stockholder. In 1972, Devers Properties conveyed the property to Brandt and Brown for $705,000, and cancelled the 99 year lease. Doris was not a party to, and

was not aware of, either the 1971 or the 1972 conveyance. Brandt and Brown later conveyed the Radnor Heights property to Chateau Corporation and C.F. Prospect, Inc., which subsequently converted the apartment building to condominiums.

Malcolm Devers died in 1974. In Virginia, a surviving spouse is entitled to a dower interest in one-third of any real estate of which his or her spouse was seised during coverture. Va.Code § 64.1–19 (1973). When Doris married Malcolm in 1963, he had a fee simple interest subject to the lease in the Radnor Heights property, or in practical terms, the right to receive $5,000 in rent every month, and the reversion of the land and the building in 2062.

## II.

■ We wish to make clear at the outset the interest to which dower attached. Doris Devers contends that Malcolm had a fee simple absolute interest in the property during coverture. She claims it was improper for the district court to limit her dower to the right to receive rents and the right to the reversion. We disagree. After 1963, Malcolm Devers had no greater estate than the fee simple subject to the 99 year lease.

Under Virginia law, a "surviving spouse shall be entitled to a dower or curtesy interest in fee simple of one-third of all the real estate whereof the deceased spouse ... was at any time seized during coverture of an estate of inheritance." Va.Code § 64.1–19. In 1963, Malcolm was seised of the Radnor Heights property in fee simple absolute; a lease for a term of years does not interrupt a landowner's seisin for purposes of determining dower. 1 R. Minor, *The Law of Real Property* § 261 at 330 (2d ed. Ribble 1928). However, the description of seisin does not define *the interest* in which the surviving spouse has dower. Minor continues with the following illustration at 331:

> [S]hould the man lease only for a *term of years*, then marry and die before the term has expired, the wife is dowable, for the husband has never parted with

the freehold or with the inheritance. She does not indeed oust the tenant for years whose claim is paramount to hers, but she is dowable in the *reversion* of which the husband is seised during the coverture, and as the owner of one-third of the reversion for her life she has one-third of the rent, which follows the reversion. *See also* C. Scribner, *A Treatise on the Law of Dower*, Vol. 2 at 776 (1883); *Campbell v. Lynch*, 81 W.Va. 374, 94 S.E. 739, 744 (1918).

■ Had Malcolm died without conveying the property to Brandt and Brown, Doris would thus have been entitled to a life estate in one-third of the reversion and the rent. If the husband had, for example, placed a mortgage upon the land before marriage, one would deduct the amount of the mortgage from the reasonable sales value of the unencumbered fee for the purpose of determining the amount of the wife's dower interest. These results suggest that the ascertainment of the estate in which the deceased spouse had seisin does not necessarily determine the dower interest of the surviving spouse. A prior encumbrance, in this case a lease, will reduce the amount of dower. A court that sets out to define a dower interest, therefore, cannot stop with seisin; it must proceed to determine the greatest interest held by the deceased spouse during coverture. In this connection, we cannot look at the fee apart from the lease. The fee was subject to the lease, and the encumbrance of the lease materially affects the interest in which the surviving spouse has dower.

We thus agree with the district court that

> the only thing of which Mrs. Devers was endowed was what Mr. Devers had, and what he had at the time of his death and at the time of the alienation of '71 or '72 was the right to receive $5000 a month.... That is what he then undertook to divest himself of if you will in '71 or '72. He could not do so without Mrs. Devers joining in the deed. She did not join the deed, so, therefore, she retained her dower interest in what he undertook

to give away. But she only has dower in what he had to give away.

The most during coverture that Malcolm ever had to give away was the right to receive rents from the lease and the reversion.

■ Doris argues that when Brandt and Brown cancelled the lease in 1972, Malcolm held a fee simple absolute, however fleetingly. This argument is at best a formalism. The cancellation of the lease and the sale of the property occurred on the same day; they should be regarded as interdependent and contemporaneous. *See* 2 R. Powell, *The Law of Real Property* ¶ 209[1] (1985); Minor, *Real Property*, §§ 256–57; *Hurst v. Dulaney*, 87 Va. 444, 12 S.E. 800 (1891). The extinction of the leasehold and the transfer of the fee were dependent parts of one transaction. One cannot imagine Brandt and Brown agreeing to cancellation of the lease without Malcolm's conveyance of the fee. After the lease was cancelled, Malcolm could not lawfully have reneged on his promise to convey the fee. Since we regard the two parts of the transaction as having occurred simultaneously, Malcolm never had an estate during coverture greater than the fee subject to the lease. Therefore, Doris is entitled to dower in one-third of the rents and the reversion.

■ Doris Devers' next contention, that the district court erred in allowing Chateau a right of election under Va.Code § 64.1–39, is also meritless. Section 64.1–39 permits alienees to elect to keep the property and pay the surviving spouse interest on one-third of the value of the deceased spouse's interest in the realty. Doris argues that § 64.1–39 applies only to innocent third parties, and that Brandt and Brown knew or should have known that Malcolm Devers was actually married. We see nothing in the record that indicates an attempt to defraud Doris Devers by Chateau, Brandt and Brown, Prospect House, or the property owners. Furthermore, there is no mention of Doris Devers in the Radnor Heights chain of title; the relevant deeds in fact recited that Malcolm was divorced and not remarried. Section 64.1–39 was the correct section to apply in such circumstances. Its purpose was to assist innocent and unwitting owners. We therefore affirm the district court both with respect to the characterization of Malcolm Devers' interest and the application of § 64.1–39.

### III.

■ We cannot accept, however, the district court's valuation of the reversion. We note preliminarily that neither party has challenged the valuation of the rental stream at $755,000, a computation of the present value of $60,000 per year for 88 years, using a discount rate of eight percent. The district court should have used the same method to calculate the present value of the reversion. The question is what a reasonable investor would pay in 1974—the year of Malcolm's death—for a reversionary interest in the year 2062. The district court valued the reversion at $8,000,000. Because the figure of $8,000,000 does not comport with the established method of valuing reversions, with reasonable investment behavior, or with commentary or case precedent, we reverse.

■ Before the district court, the parties offered wildly divergent valuations of the reversion. Both parties agreed that the market value of Radnor Heights in 1974 was $8,000,000. There the agreement ended. Vincent Marcum, the expert called by Doris Devers, testified that the Radnor Heights property would appreciate over the term of the lease at or above the rate of inflation. That is, the value of the property would remain the same in 1974 dollars or increase. From this, Doris Devers concluded that in 1974 the value of the right to the reversion should be $8,000,000.

Scott Humphrey, the expert called by Chateau, took a different approach. Assuming that the value of Radnor Heights would be $8,000,000 in 2062, Humphrey then asked what someone would pay today to receive the reversion in 2062. Using a discount rate of ten percent, applied to the

assumed $8,000,000 value for Radnor Heights in 2062, Chateau countered that the 1974 value of the reversion was $1,600.[1]

The district court accepted Doris Devers' figure, and found that the value of the reversionary interest was $8,000,000.

We cannot agree. To begin with, a reasonable investor in 1974 would have no idea what she would be getting in 2062. The chief ingredient of modern life is change. The one certain thing about the future is uncertainty. While an investment, of course, is a bet on the future, the investor seeks to hedge that bet by maximizing knowledge and minimizing risk. In the present situation, neither course is possible. While Radnor Heights is resplendently described by appellees as "the crown jewels," convenient to Rosslyn and other major employment centers, with a "virtually unequalled" view "directly across a national park and the Potomac River," there is no assurance that it will remain so past the middle of the next century. By then, the improvements on the property will have run their useful life, and the "jewel" of 1974 may by 2062 be set in a slum.

The implausibility of a reasonable 1974 investor taking an $8,000,000 chance on a 2062 reversion is thus readily apparent. The owner receives no income from the reversion for the long duration of the lease. Nor can the owner of the reversion enjoy it in her lifetime; she would not have it until 2062. In fact, the property would be unlikely to benefit anyone she knew. It is further difficult to believe that anyone would buy a 2062 reversion for $8,000,000 when she could buy the fee simple absolute in 1974 for the same sum. *See Department of Public Works and Buildings v. Metropolitan Life Insurance Co.*, 42 Ill. App.2d 378, 192 N.E.2d 607, 614 (1963).

Given the disincentives to invest in long-term reversionary interests, both real estate appraisers and courts commonly employ the method used by Humphrey to establish the value of a reversion after a long term lease. Humphrey assumed the property would be worth $8,000,000 in 2062. Such an assumption of the constant face value of a fee in a long-term lease is acceptable, not as a forecast of the actual value of the property 88 years hence, but as an indication of the inability to make such a forecast, with all its attendant effects upon investment decisions. Using this constant value, Humphrey next calculated how much one would need to invest in 1974 at the market interest rate to receive $8,000,000 in 2062. Real estate appraisers commonly use this approach to calculate the present value of a leased fee that will revert to the lessor after a given number of years. *See, e.g.*, S. Kahn and F. Case, *Real Estate Appraisal and Investment*, 2d ed. at 161 (1977). Using the eight percent discount factor applied by the district court, the present value of a 2062 reversionary interest in 1974 amounts to approximately $8,800.[2]

---

**1.** Humphrey's method was as follows:

The present value of $1 due in $n$ periods can be calculated by using the equation $PV = 1/(1 + i)^n$ where $i$ is the market interest rate. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 n. 21, 103 S.Ct. 2541, 2551 n. 21, 76 L.Ed.2d 768 (1983). In this case, the periods are years. The calculation can be simplified by using a present value table, such as the Inwood coefficient table, which gives the discount factor for a given interest rate and a given period of time. One multiplies the discount factor by the sum to be received at a future date to obtain the present value of that sum. Here the question is what someone would pay for the right to receive $8,000,000 in 88 years. Using the equation above, the present value of $8,000,000 = 1/(1 + i)^{88}$ times $8,000,000.

Humphrey used a market interest rate of 10%. Plugging 88 years and 10% into the Inwood coefficient tables, Humphrey found a rate of .0002, which he then multiplied by $8,000,000 to reach the value of $1,600.

**2.** In its brief, Chateau calculated the present value, $8,800, by multiplying $8,000,000 by a discount factor of .0011, the factor from the Inwood coefficient tables. That discount factor is rounded to the nearest ten thousandth. If one calculates the present value without the table, $(1/(1 + .08)^{88}) \times \$8,000,000 = \$9,157.98$. The district court may determine the appropriate value, using the figures that are consistent with its earlier calculation of the present value of the rental stream.

This method parallels valuations of reversions following a long term lease in condemnation proceedings and in tax cases. In both situations, courts have approved valuations based on an estimate of the value of the reversion at the end of the lease, discounted to present value. *See, e.g., Odend'hal v. Commissioner,* 80 T.C. 588, 607–08 (1983), *aff'd* 748 F.2d 908 (4th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); *United States v. Certain Property Located in the Borough of Manhattan, City, County and State of New York,* 306 F.2d 439 (2d Cir. 1962); *In re Parking Field at West Hempstead in Unincorporated Area of Town of Hempstead,* 232 N.Y.S.2d 100 (N.Y.Sup.Ct. 1962). "Since the landlord has only a reversionary interest 95 years after the condemnation date, the determination is predicated upon establishing a sum which, if deposited now at compound interest in an expressed amount, would eventuate, upon termination of the leasehold, in his receipt of the amount established as his loss." *Department of Public Works,* 192 N.E.2d at 612.

It is true that if one uses this method, and an eight percent discount rate, the value of a reversion after an 88 year lease is quite small. Commentary on the value of reversions after long-term leases supports this result: the value of a reversion in such a case is negligible. 4 *Nichols' The Law of Eminent Domain* § 12.42[3] (3d ed. 1985). The rental stream, not the reversion, is the item of worth. Awards to landlords in condemnation proceedings make the respective values clear. "In a long-term lease (say ninety nine years) on which the danger of default is negligible, the landlord's entire interest in the property can be valued by treating it as a mere secured right to a permanent annuity, the amount of the annuity being measured by the net rentals. Here the reversionary interest has so little present value that it may be disregarded in estimating the compensation to be paid the landlord." 1 L. Orgel, *Valuation Under the Law of Eminent Domain,* § 122 at 529 (2d ed. 1953).

While there is no dispositive Virginia holding, case law from other jurisdictions reiterates that the possibility of a reversion after a long term lease is not to be considered in determining the market value of the property. *James Blackstone Memorial Library Association v. Gulf, Mobile and Ohio Railroad Co.,* 264 F.2d 445, 452 (7th Cir.1959). *See, e.g., Chicago and N.W. Ry. Co. v. Chicago Mechanics' Institute,* 239 Ill. 197, 87 N.E. 933, 943 (1909). In New York condemnation proceedings, the holder of a reversion after a long term lease is in a similar position. "In a long term lease, having over 90 years to run, where the danger of default by the lessee is minimal because of extensive improvements made on the property, the reversionary interest has little present value, and the lessor is entitled to a very minor part of the proceeds of an appropriation." *Airport Lodge of Rochester, Inc. v. Brooks-Buell, Inc.,* 40 A.D.2d 1077, 339 N.Y.S.2d 220, 221 (1972). *See also Mayor and City Council of Baltimore v. Latrobe,* 61 A. 203, 101 Md. 621, 640 (1905). The present value of the reversioner's rights when a lease has 88 years to run is negligible. *See United States v. Benning Housing Corp.,* 276 F.2d 248, 251 (5th Cir.1960).

■ The fee can thus be considered as a bundle of interests, in this case, the leasehold, the reversion, and the right to receive rents. The parties agree that the fee simple absolute was worth $8,000,000 and the rental stream was worth $755,000. The reversion is the least valuable of the rights in the lease fee bundle; one would not expect it to be worth more than the rental stream, nor would one expect the reversion and the fee simple absolute to be equal in value. The district court's valuation of the reversion at $8,000,000 thus produces an anomalous result, one that cannot be allowed to stand.

### IV.

■ For the foregoing reasons, we reverse the district court's valuation of the present worth of the reversion. We see no merit in remanding for a second valuation

by the district court. "Although there are many cases in which it would be quite irresponsible for the court of appeals to direct entry of judgment, ... it is a great hardship to litigants and district judges to have a case sent back to the district court again and again, as happens all too often. If a case has been once before in the court of appeals, the court should make every effort to assure that its second coming is its last." R. Posner, *Federal Courts*, 244 (1985).

This case has been proceeding almost three years; it has now been to the court of appeals twice in as many years, *see* 748 F.2d 902 (4th Cir.1984); the legal talent that has been invested in it is already quite prodigious; and there remains time to resolve this aspect of it fairly before Radnor Heights becomes the subject of a modern-day *Bleak House*. Testimony on the value of the property in the year 2062 would necessarily be extremely speculative. Given the hopeless divergence of the parties the first time around, we do not believe that additional testimony would be helpful. The courts and the commentators agree that the value of a reversion after a long term lease is slight. In the face of this substantial body of opinion, supported as it is by light of reason, we direct the district court to calculate the present value of the reversion in the manner it employed to calculate the rental stream, with the appropriate discount rate of eight percent.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

3. *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921).

4. It is only a surmise but, as an explanation of his 1971 and 1972 shenanigans, perhaps he had encountered difficulties arising from that earlier wife's insistence on satisfaction of her dower rights.

5. Apparently there was a modification so that the lease term in fact commenced almost two months later on August 7, 1963.

6. Lawrence Brandt and Donald Brown, trustees for Prospect House, Joint Venture, as assignees

MURNAGHAN, Circuit Judge, dissenting:

Justice Oliver Wendell Holmes, Jr. was justly renowned for many contributions to legal lore. As famous perhaps as any was his equation of a page of history to a volume of logic.[3] My dissent from the opinion of the panel majority stems from disagreement over the teachings of history.

Malcolm B. Devers owned a parcel of unencumbered Virginia real estate in fee simple absolute. He began to assemble the parcel in the 1950's and, by 1962, it had been fully acquired as the result of a property settlement resulting from dissolution of an earlier marriage than his subsequent one to Doris Devers.[4]

Thereafter, on October 22, 1962, while Malcolm Devers was unmarried, he leased the parcel to Congressional Apartments, Inc. for 99 years, June 17, 1963 to June 16, 2062,[5] at an annual net rental of $60,-000.00.[6] In values as of the time Malcolm B. Devers entered the lease, the reversion after that lease was to expire in all probability could have been realized on for little or nothing. The fee simple absolute then, of course, had a value of substantial magnitude (at a minimum the capitalized worth of $60,000 *per annum* for 99 years). Malcolm Devers then, in terms of title, owned a fee simple absolute, subject to the 99 year lease, such fee simple absolute including the reversion following termination of the 99 year lease.

Had the title remained in that state until Malcolm Devers' death, I should find myself in complete agreement with the panel

from Congressional Apartments, Inc., promptly razed existing buildings and constructed a 12 story apartment house consisting of 268 residential units and three commercial units. It has been known variously as Radnor Heights or as the Prospect House Condominium.

Brandt and Brown, throughout the period with which the case is concerned, occupied the position which Chateau Corporation and C.F. Prospect, Inc. along with individual condominium owners, by mesne conveyances, at present occupy.

majority. If dower, which arose on November 1, 1963 with the marriage of Malcolm Devers and Doris Devers, amounted only to the right, for Doris Devers' life, to one-third of the $60,000 annual rental and a theoretical life estate in the reversion after passage of the 99 years as to one-third of the fee, I should not quarrel with accepting, as the parties seemed to accept below, the capitalized valuation of the term of years at $754,313.83 (rounded, for ease of reference in discussion by my brother, Judge Wilkinson, to $755,000 and, by me, for similar, though greater, ease of reference and calculation to $750,000). I should also concur in the majority's conclusion that the reversion after termination of the 99 year lease in 2062 was of negligible value.

There is, however, a need to consider the consequences of application of the ancient doctrine of seisin, coupled with the long extent concept of dower,[7] designed to soften the rigors otherwise visited upon a widow because of the English common law's early preference for the lodging of property rights in men to the disadvantage of women.[8]

Seisin came into play in any case of a man and his wife only upon the commencement of, and thereafter for the duration of, coverture, and then, so far as she was concerned, only if the woman was the survivor. Before their marriage the man, as seisin holder, was free to create such rights in a parcel of real estate as he pleased superior to claims of a subsequent spouse. He could, prior to marriage, convey a fee simple absolute in which case his seisin would be totally ended, and dower would never arise in that parcel, assuming it was never reconveyed to him.[9] He also could grant, prior to marriage, a term of years in which case, however, and the point is of determinative importance, seisin fully remained in him and, in a derivative sense, arose in his subsequent wife. In that case, however, upon marriage, while inchoate dower, and supporting seisin, thereupon arose in the wife, nevertheless, the dower was entirely subordinate to such portion of the term of years as might still be outstanding upon the husband's death with his widow surviving.[10] Of course, if the term of years had terminated before the husband's death, she would, upon such termination, be entitled to dower, both inchoate and consummate as though the term of years had never existed, the controlling consideration being the state of title when the dower becomes consummate, i.e., at the husband's death.[11] Upon termination after his death of the lease which had still been outstanding and unexpired at his death, the widow would thereafter, for her lifetime, be entitled to dower unsubordinated to the no longer extant lease.

It is relevant to observe one conceptual change in dower accomplished by such a grant of years with, as in the present case, a fixed annual rental. In the perhaps more usual situation, where the fee simple of the husband is entirely unencumbered at the time of marriage, the wife's inchoate dower remains subject to fluctuations in value throughout his life[12] and, as this case proves, the fluctuations can be huge. The

---

7. *See* Va.Code § 64.1–19.

8. No doubt reflecting modern concerns for equality of rights between the sexes, curtesy plays a similar role for a husband's interest in land of his wife. Va.Code § 64.1–19.1.

9. *E.g., Chapman v. Chapman's Trustees,* 92 Va. 537, 538, 24 S.E. 225, 226 (1896) ("... a widow has no dower in lands sold by her husband, prior to his marriage...").

10. *Cf.* 2 *Minor's Institutes* Ch. VIII at 129 (2d Ed.1883) ("Lease by husband before marriage, for term of years, reserving rent during the term.... Husband marries and *dies before the term ends....* [W]ife is entitled to be endowed

... [but] she does not oust the tenant, whose claim to the possession is paramount to hers.") (Emphasis provided).

11. Upon expiration of the term before the husband's death the inchoate dower is no longer subordinate to the lease, it no longer being in existence.

12. *Kelly v. Minor,* 252 F. 115, 117 (4th Cir.1918) ("... its amount is uncertain and variable, if she survives, because it depends not on the value of the property when the husband becomes bankrupt, but on its value at the time of his death.").

record indicates a value for the fee of probably no more than $1,000,000 in 1962, of $8,000,000 in 1974 and $23,000,000 in late 1979 or early 1980. However, the availability of Radnor Heights to Doris Devers' claim to dower was substantially changed by the pre-marital 1962 lease for 99 years as long as it remained in existence. Dower was not eradicated for the term of years by the 99 year lease but it, during the husband's lifetime, and so long as the lease was in effect, was converted by the October 22, 1962 lease from an unencumbered inchoate interest in the fee simple absolute arising upon the November 1, 1963 marriage into an interest, also inchoate, attaching to the reversion following the term of years amounting essentially to the right to receive rental thrown off thereby,[13] both the reversion and the right to receive rents still being held in seisin by Malcolm Devers on November 1, 1963 when Doris Devers and Malcolm Devers were married.[14]

That means that the risk of fluctuation (*i.e.*, possible benefits and possible disadvantages) shifted to Brandt and Brown, the holders of the term of years. As things have turned out, the fluctuation here appears pretty steadily to have gone up, but what goes up may come down, and, in the law's contemplation, the possibility of changes in value in both directions must be taken into account.

Of course, what has been said heretofore about grants or conveyances by Malcolm Devers prior to the marriage of Malcolm Devers and Doris Devers on November 1, 1963 has no applicability to transfers by

Malcolm Devers after that date without joinder in the necessary documentation or other evidence of consent on the part of Doris Devers. Any and all such transfers would be subordinate to her dower rights. It is not even contended that Malcolm Devers' August 10, 1971 deed to his wholly owned corporation, Devers Properties, Inc., in which he was described as "divorced" and purported to convey Radnor Heights, or his April 14, 1972 deed in conjunction with Devers Properties, Inc. seeking to convey the land, free from encumbrances in which he is described as "divorced and not remarried" had the effect of eliminating her inchoate rights in the reversion, or her inchoate rights in the annual $60,000 rental. His interest simply did not extend to his wife's non-consenting inchoate dower and it was altogether unaffected, even though the seisin in Malcolm Devers which gave rise to Doris Devers' dower, as a right beneficial in nature for Malcolm Devers alone, was entirely at an end. The point is that the ending of his conveyances following coverture accomplished nothing insofar as her interests, those of a non-participating wife, were concerned. They, as dower based on seisin in her directly, or derivatively through him, remained in full force and effect.

Disregarding the extent of the effectiveness or significance of a conveyance to one's own corporate *alter ego*, prior to the 1972 deed the title inescapably was fee simple in Malcolm Devers subject to the unexpired term of the 99 year lease with

---

**13.** I disregard for purposes of discussion the inconsequential value of dower in the reversion following the 99 year lease. Putting aside the possible upward fluctuation, *de minimis* for present purposes, which might be attributable to a strengthening in the value of the underlying real estate as security *for payment of the rent* or relatively insignificant variations in interest rates, factors of no moment in the instant case as things have worked out, the lease would have a constantly calculable, ever decreasing valuation. Its value would represent a fixed capitalization of the rent based on a steadily diminishing term. The value over time, therefore, should go but one way, namely down, on a regular linear basis.

Thus, at some point in time the reversion would take on a value, a steadily increasing one, but in 1974, with 88 years of the lease still outstanding, the time was not yet.

**14.** *See, e.g., Wheatley v. Best,* Cro.Eliz. 565 (Court of Common Pleas 39 Eliz. 1597); *Hitchens v. Hitchens,* 2 Vern. 403, 23 Eng. Reprints 81 (High Court of Chancery 1700); *Stoughton v. Leigh,* 1 Taunt. 402, 11 Rev.Rep. 810 (Court of Common Pleas 1808); *Sheaf v. Cave,* 24 Beav. 258, 53 Eng. Reprints 357 (Rolls Court, Chancery 1857); *Campbell v. Lynch,* 81 W.Va. 374, 385, 94 S.E. 739, 743–44 (1917); *Graham v. Smith,* 170 Va. 246, 256–57, 196 S.E. 600, 604–05 (1938); *Brack v. Coburn,* 210 Ark. 334, 339–40, 196 S.W.2d 230, 233–34 (1946).

inchoate dower in fee simple in Doris Devers, also subordinate to the unexpired term of the 99 year lease. Malcolm Devers then had full seisin. The 99 year lease enjoyed no seisin. *Brack v. Coburn, supra,* 210 Ark. at 339, 196 S.W.2d at 233. Doris Devers' seisin was derivative from him though immune from alteration by him without her consent.

Following the 1972 deed, the beneficial interests of Malcolm Devers, personally, in Radnor Heights entirely evaporated yet his seisin continued to exist to the extent necessary to support Doris Devers' dower rights (which were still inchoate, *i.e.,* subject to her survival of Malcolm Devers, but in no way whatever surrendered or relinquished by her). He gave up in 1972, for $705,000, insofar as he personally was concerned, not only the reversion following expiration of the 99 years, but also the right to $60,000 *per annum* under the lease which had been cancelled and declared null and void by him and by Brandt and Brown. He ceased in 1972 to collect $60,000 *per annum.* Doris Devers, however, it is to be emphasized, neither in 1972, nor at any other time, gave up anything.

Presumably, it was an unanticipated consequence that Brandt and Brown, while moving to a fee simple absolute position insofar as Malcolm Devers was concerned, nevertheless caused their preferred position as to Doris Devers' dower claims to evaporate. However, that is simply because the preferred position depended on the continued existence of a lease grant to them from Malcolm Devers made prior to coverture. Before the 1972 deed, the October 22, 1962 lease was the only document creating an interest in Brandt and Brown. Once the title of Brandt and Brown derived from Devers Properties, Inc.'s and Malcolm Devers' 1972 conveyance, and that conveyance alone,[15] it was a title interest created *after* coverture, without the wife's consent, and, therefore, wholly subordinate to Doris Devers' dower rights, which were still inchoate in 1972, but which matured, becoming consummate, with Malcolm Devers' July 27, 1974 death, she surviving him.

Her husband had been seised during coverture and her dower rights had not been barred or relinquished. Virginia Code § 64.1–19. There being no lease to which her dower was subordinate at the time of her husband's death, her dower became consummate in a fee simple absolute in Radnor Heights. The panel majority has questioned that result presumably regarding it as harsh [16] since Brandt and Brown probably believed they were getting more,[17] not giving up something, in the

---

**15.** Until 1972, manifestly Brandt and Brown, holding only as lessees of a term of years, had no seisin whatsoever in Radnor Heights. *Brack v. Coburn, supra,* 210 Ark. at 339, 196 S.W.2d 233.

**16.** However, in the nature of things, to be gentle to one litigant, as the court should be to Doris Devers as someone entitled to dower (*see Devers v. Chateau Corp.,* 748 F.2d 902, 906–07 (4th Cir.1984)), requires, of necessity, correlative harshness to another or others. The mischief here stemmed from Malcolm Devers' concealment of the existence of a marriage in effect 8 years 5½ months (from November 1, 1963 to April 14, 1972). If the duration of the concealed marriage had been 9 years 6 months (October 15, 1962 to April 14, 1972), the harshness would have been no greater, viewing things from the point of view of Brandt and Brown, but then the superiority of the dower interest of Doris Devers over the 99 year lease could not be questioned. The dower would have arisen prior in time to the 99 year lease. Six days of dower being unencumbered by the lease at the outset would

have given Doris Devers' dower precedence. Such a consequence of timing at the commencement of the lease in 1962 is no different from the consequence of the lease's termination on April 14, 1972. For over two years (April 14, 1972 to July 27, 1974) there simply was no lease in a position superior to Doris Devers' dower.

**17.** It should be remarked that the "more," the reversion, was extremely secondary in nature. Eradication of the 99 year lease was the prime objective. Brandt and Brown proceeded on the assumption, correct as to Malcolm Devers, that what he had to sell to them, primarily was first and foremost the right to rentals under the 99 year lease, and, only secondarily, the reversion after the termination of the 99 year lease. Counsel for the defendants have convincingly shown that the reversion had no substantial worth, the $1600 value as of July 27, 1974 assigned by an expert for the defendants was, in a case of the monetary size of the present one, truly *de minimis.* What Brandt and Brown were principally concerned about in entering

1972 deed.[18] However correct that belief may have been as to Malcolm Devers, Brandt and Brown did not deal with Doris Devers. They failed to reckon with mine hostess. Doris Devers, unaware of its existence, had nothing whatever to do with the making of the April 14, 1972 deed or the motivations of the parties who entered it.[19] If we do encounter here a choice between two innocent parties, Brandt and Brown brought the risk of unfortunate consequences from Doris Devers' existence and survival of Malcolm Devers upon themselves. We can assume that everyday prudence would have dissuaded them from cancelling the October 22, 1962 lease had they known of Doris Devers' existence, but her putative existence as an obvious possibility is something of which they were chargeable with knowledge. There is no absolute defense assured of success which can be relied on by one taking a conveyance from a scheming, devious and infernally fortunate rogue such as Malcolm Devers.

A. James Casner, a teacher with more than a passing familiarity with the law of property in all its arcane manifestations, spent a whole hour of a law school course in which I was a student extracting from the class ingenious, but in the end never wholly satisfactory solutions to the problems which a clandestine marriage presents when real estate is conveyed. Had the question only arisen then in the posture of the present case, I might have dared as a practical answer to suggest substituting "Danny" for "Malcolm" and hanging Mr. Devers in the morning.

the April 14, 1972 transaction was to obtain relinquishment of the obligation to pay $60,000 *per annum* for all the remaining 89 years of the unexpired term. Brandt and Brown doubtless thought they were obtaining a fee simple absolute, and the principal reason for doing so almost certainly was to permit conveyances to third parties of parcels comprising Radnor Heights, as indeed occurred upon condominiumization in 1980. For that to be possible, as a practical matter, above all else the obligation to pay the $60,000 *per annum* had to be ended. The 99 year lease permitted subleases "not … beyond the expiration date" of the 99 year term, but contained no similar provisions permitting creation of condominium interests.

In clearing up those deficiencies in title they largely succeeded for, in return for $705,000 Malcolm Devers gave up the $60,000 *per annum* for the rest of his life and the $60,000 *per annum* so far as they were concerned, believing Malcolm Devers had no wife, for every year thereafter. The wiping out of the term of years was the main objective and it was largely accomplished. The one exception, obviously not contemplated by Brandt and Brown, or, if contemplated, dismissed on the strength of Malcolm Devers' asseveration that he was unmarried, was the dower in Doris Devers, and it would, in all events, prove a problem only if Doris Devers should, in fact, survive Malcolm Devers.

Brandt and Brown were gambling that there were no dower rights deriving from Malcolm Devers. Brandt and Brown would have won the gamble, even if that were not, in fact, the case, had Malcolm Devers outlived Doris Devers. However, her rights attached to her dower and its underlying seisin were, prior to the April

14, 1972 deed, subordinate only to one set of superior interests, specifically the 99 year lease. Brandt and Brown, on extinguishing the lease, chose to take a step which inexorably improved the state of any dower that might theretofore have been inferior to the 99 year lease. But Brandt and Brown thought there were no such interests, largely no doubt because of Malcolm Devers' misstatement as to his marital status. Brandt and Brown, however, not Doris Devers, took the risk that he might have lied. They must bear the consequences which resemble what has happened in many other cases where a court has been called upon to protect a wife's dower against an attempt at depredation by the husband or even against a perfectly innocent purchaser's failure to pay sufficient attention to the possibility of dower.

18. Perplexities of this nature make dower uncongenial to some contemporary minds. Indeed, perhaps for analogous reasons, in some places dower has been altogether abolished. *See, e.g.,* Md.Code Ann., Estates and Trusts § 3–202. The Virginia legislature, however, as it was free to do, has chosen to go the other way and to enhance dower. For dower interests arising since July 1, 1977 dower has been increased to a fee simple interest rather than merely the life estate available in the present case where dower had not merely arisen but had become consummate in 1974. Va.Code § 64.1–19.

19. *Kelly v. Minor,* 252 F. 115, 116 (4th Cir.1918) ("That interest [dower], however, is a valuable property right, which belongs to the wife exclusively, and of which she cannot be deprived by any act of her husband.").

Doris Devers, unlike Brandt and Brown, exposed herself to no risk and is answerable for none. Doris Devers and her rights to dower, after all, enjoy a jealously protected preferential position in law. *Lewis v. Apperson*, 103 Va. 624, 629, 49 S.E. 978, 980 (1905) ("It [dower] has for its object the sustenance of the widow and the nurture and education of her children, if she have any, and is favored in law. Indeed, such was the favor with which it was regarded by the ancient common law that it grew into a maxim 'that the law favoreth three things—life, liberty, and dower.' ").

Moreover, Brandt and Brown did receive something positive from the April 14, 1972 deed. They were, upon its execution, relieved of thereafter paying $60,000 *per annum* for another 89 years. No payments of that kind have been made by Brandt and Brown or their successors since April 14, 1972. Fluctuation in value could conceivably make the purchase for $705,000 of Malcolm Devers' right to receive rent a wise, or equally make it an unwise, deal. Fluctuation possibilities, however, had been allocated to the lessees when the October 22, 1962 lease agreement came into existence.[20] Dower is valued only as of the time it becomes consummate, *i.e.*, the date of the husband's death. *Cf.* Va.Code § 64.1–39 ("the value at the husband's death").[21] Hence the fluctuation downward on April 14, 1972 of the value of Brandt's and Brown's interest properly was allocated to them; just as the upward fluctuations in value thereafter went to Doris Devers' benefit.

Malcolm Devers did ungentlemanly things when he a) married Doris Devers without ever thereafter disclosing to her, much less securing her consent to, his 1971 and 1972 transactions involving his ownership in the parcel of land, and b) actively dissimulated to the third parties he was dealing with as to such ownership's being subject to dower in Doris Devers by signing a deed in fee simple absolute general warranty form of March 10, 1971 to Devers Properties, Inc., falsely proclaiming that he was divorced, representing that he had done no act to encumber, and adding a covenant of quiet possession.

Those deceptive practices were followed up by a sale in fee on April 14, 1972 for $705,000.00 of the real estate to Brandt and Brown, the owners of the unexpired portion of the 99 year lease. Needless to say, the record documents made no mention of Doris Devers or her inchoate dower right. Malcolm Devers was inaccurately described as "divorced and not remarried." As part of that sale, the 99 year lease of October 22, 1962 was "cancelled by the parties" and rendered "legally null and void." Thereby, the 99 year lease ceased to have any further existence. The April 14, 1972 deed from Devers Properties, Inc. to Brandt and Brown was also fully executed by Malcolm Devers and purported to convey all right, title and interest in fee simple.

Consequently, when dower moved from inchoate to consummate status with Malcolm Devers' death on July 27, 1974, causing Doris Devers to become, under Va.Code § 64.1–39,[22] entitled to annual interest at 8% on "one-third of the value, at the husband's death, of the real estate so aliened," to the defendants or their predecessors in title,[23] the question of paramount impor-

---

**20.** It appears that, with the April 14, 1972 nullification of the October 22, 1962 lease, fluctuation again played a major role for Doris Devers.

**21.** Virginia law may early on have been otherwise. *See Tod v. Baylor*, 4 Leigh 498 (Va.1833). However legislative enactment of a code predecessor to Va.Code § 64.1–39, Va.Code Ch. 110 § 12 (1849), brought *Tod v. Baylor* into line with customary common law making the date of the husband's death controlling on the value of dower. *Verlander v. Harvey*, 36 W.Va. 374, 15 S.E. 54 (1892).

**22.** At the option of the defendants, the statute conferred on them, as alienees of the fee simple subject to dower, the right to commute Doris Devers' entitlement to receive the property in kind to an annuity in cash.

**23.** Va.Code § 64.1–39 calls for a deduction for the value of permanent improvements made subsequent to alienation. The district judge ordered such a deduction to be made, finding that alienation occurred on March 10, 1971. None of the parties addressed the subject on appeal. It appears that capital improvements were substantially completed well before March 10, 1971.

tance was what was the nature of the estate in which consummate dower arose.

It appears that, with the sole exception of the 99 year lease, Malcolm Devers unquestionably had unencumbered fee simple absolute title to the real estate when he and Doris Devers married. Dower, of course, would have been subject to that term of years to the extent it had not expired by passage of time and was otherwise in full force and effect. However the controlling fact is that the term of years had totally ceased to exist over two years before the dower became consummate.[24]

The situation is no different than if cancellation had occurred by reason of nonpayment of rent, or, if, for any other reason, the lease was surrendered by the lessees. It is true that Brandt and Brown, *vis-a-vis Malcolm Devers*, had obtained a larger right by the 1972 transaction, a conveyance of all of Malcolm Devers' rights in the property, but they did so by a conveyance following the commencement of and during the continuance of coverture. They acquired a full fee simple absolute if Malcolm Devers should survive Doris Devers, but remained subject to dower should she outlive him. The transaction was not acquiesced in by the wife, so could have no adverse consequence for her. That did not rule out, however, a consequence of benefit to her. The exchange was not a merely technical matter affecting nothing of substance, for it included the payment of

$705,000 by Brandt and Brown to bring about the total demise of their obligation to pay rent of $60,000 per year. Malcolm Devers pocketed, or had applied for his benefit, the tidy sum of $705,000.

Brandt and Brown entered the transaction knowingly. Their eyes were open, although, as things turned out, they were not perceptive enough to appreciate the deception practiced on them by Malcolm Devers as to his matrimonial status. However, the possibility was one Brandt and Brown or their legal advisers should have been able to discern. They took the risk that there was someone out there married to Malcolm Devers, or, as against Doris Devers, are chargeable with having done so, to achieve their objective of putting to rest for all time the October 22, 1962 lease and its requirement that $60,000 *per annum* be forthcoming. The 1972 deed, in relieving them once and for all a) from the continuing drain of paying to Malcolm Devers $60,000 *per annum*, and b) the inability to create and market condominiums conferred on them a distinct and palpable advantage. If, as we assume, for present purposes, Brandt and Brown were, indeed, duped, no less so was Doris Devers. The law of dower grew up to protect a widow and her rights are jealously guarded. Brandt and Brown may well not have contemplated the crucial timing change in regard to the fixing of priorities for interests seeking to

---

On the one hand, were my view to prevail, it may well be that the defendants nevertheless have a strong argument, not yet disposed of, that alienation occurred on October 22, 1962 or November 1, 1963. The plaintiff, on the other hand, can point to language in the October 22, 1962 lease according to the landlord the improvements upon termination of the lease. Hence, were my dissenting view to prevail, I should, without having formed any opinion on the subject, favor a remand not only a) to calculate the consummate dower as of July 27, 1974 on the basis of a fee simple absolute, unencumbered by the previously terminated 99 year lease but also b) to permit exploration of the propriety of betterment deductions.

24. It is perhaps not amiss to observe that such a possibility was recognized to exist from the outset. The lease of October 22, 1962 stated that the term was 99 years "unless this lease shall be

sooner terminated ...". The tenant could decline to cure a default whereupon "the term hereof shall cease, determine and expire ... as though such date of termination were originally set for the expiration hereof ... and the Tenant's obligations hereunder, except for the payment of past due rentals for not to exceed a period of ninety (90) days, shall cease and determine and Tenant shall be under no further obligation to Landlord hereunder." Consequently, the 99 year term while binding as to duration upon the grantor was not so on the grantee. The fact that termination, a power always in the grantee's hands, had unanticipated consequences for the grantee is no reason to deny application of the rules of the law of dower to Doris Devers, who, in no way whatsoever, brought about the consequences. *Cf., Brack v. Coburn, supra,* 210 Ark. at 339, 196 S.W.2d at 233.

come ahead of dower. November 1, 1963, however, was the day coverture, and hence inchoate dower, commenced. Brandt and Brown had traded an interest with a date antecedent to November 1, 1963 for a post-November 1, 1963 interest, albeit a larger one, insofar as their vendor, Malcolm Devers, was concerned. The interest, however, first came into being subsequent to the date coverture commenced.

Consequently, calculating as of the date of the husband's death, July 27, 1974, the starting point in valuing Doris Devers' consummate dower interest was the $8,000,-000 [25] fee simple absolute value as of July 27, 1974, divided by three and annualized at 8%.

The question then arises whether that is the ending point as well. I quite agree that if the inquiry were, as the panel majority deems it to be, whether the momentary flash of fee simple absolute ownership "enjoyed" by Malcolm Devers on April 14, 1972 were necessary to confer seisin in a fee simple absolute on him, or on his wife by way of her dower rights, or for any other purpose, the moment should be accorded no significance. Practicalities dictate that such instantaneous alteration in seisin, or in priorities associated with it, as there was, was utterly transient, that is it was not significant. *See, e.g., McCauley v. Grimes,* 2 G. & J. 318, 324 (Md.1830) (In a discussion of instantaneous seisin, the court stated: "The deed and mortgage were looked upon as constituting but one contract, bearing the same date, and delivered at the same time; and that as no interval of time intervened, between the taking and rendering back the fee, the case might be assimilated to the conusee of a fine, whose wife would not be entitled to dower, because by the same fine the estate is rendered back to the conusor; it was there considered as merely *in transitu,* and not resting for an instant; the grant and render being one entire act."). *See also Hurst v. Delaney,* 87 Va. 444, 12 S.E.

800 (1891) dealing with seisin so transitory before the purchase money deed of trust attached that it existed for no more than the wink of an eye.

The difficulty is, however, that such rolling up of everything into a single transaction is simply not feasible here. The seisin was not instantaneous. For Doris Devers it had already been in existence for over eight years on April 14, 1972 and did not change one whit on that date, remaining in full force and effect. Nor did the right to dower change. All that happened was the disappearance from the scene of an interest superior to the dower, namely, the 99 year lease. The extinction of the term of years and the grant of *Malcolm Devers'* fee simple interest were essentially simultaneous, instantaneous or contemporaneous, but the times as of which the two transactions were viewed for dower purposes were not. Whichever came first made no matter for both came long after coverture commenced. The characteristic instantaneous seisin case involves a deed to a husband contemporaneously with a purchase money mortgage, and realistically the momentary spark of seisin in the infinitesimal interval between the effectiveness of the two instruments is not deemed a basis for subordinating the mortgage to the wife's dower. Her dower attaches well enough, but only in the priority line at a point below the mortgage. Both the deed and the mortgage continue to exist. In the present case, the term of years did not. In instantaneous seisin cases, the question is one of priority between dower and another interest deriving from the husband, both of which continue in existence. Here, on the other hand, the interest competing with dower totally ceased to exist, so could not have a priority status. The seisin in Malcolm Devers coming into being at a time prior to October 22, 1962 was never extinguished for purposes of Doris Devers' dower but continued unabated from November 1, 1963 until April 14, 1972, and, indeed, on and beyond July 27, 1974 (*i.e.,* until the

**25.** The figure is conceded to be correct by all the parties to the litigation. *See,* however, note

23, *supra.*

alienees' right of commutation was exercised and hereafter payment is faithfully complied with). *McCauley v. Grimes* and *Hurst v. Delaney* [26] stood for a very different proposition, namely, that a very short term technical superiority of seisin will be ignored.

The two operative instruments, the October 22, 1962 lease, and the April 14, 1972 Deed, however, to the contrary, had and have always retained a difference of nearly ten years between them, during which an act of controlling importance, the marriage on November 1, 1963, took place. Here the case is not one of two simultaneous instruments and the question is not which one of the two shall take priority over the wife's dower. On April 14, 1972 there was involved but a single instrument dated long after November 1, 1963.

Looking at the matter from the other side, for over two years, from April 14, 1972 to July 27, 1974, the date of Malcolm Devers' death, and thereafter, there simply has been no 99 year lease nor any unexpired portion thereof. Two years are not but an instant in human time. So, as of the time dower became consummate there had existed in the real estate at most, so far as Doris Devers was concerned, the November 1, 1963 fee simple absolute in inchoate form which was a) subject to the 99 year lease from October 22, 1962 until April 14, 1972 and b) the fee simple absolute not so encumbered thereafter until July 27, 1974. Any effort by Malcolm Devers after his

1963 marriage, without his wife's participation, to create interests in others in the real estate, indisputably was subordinate to her dower interests. A conveyance by the husband redounding to the wife's benefit, however, is given full force and effect.

A consideration meriting mention is the attention which presumably all the parties to the April 14, 1972 deed, Brandt and Brown included, paid to the representation by Malcolm Devers that he was "divorced and not remarried." It is hardly to be imagined that the April 14, 1972 deed would have been accepted by Brandt and Brown had they entertained doubts on the score of Malcolm Devers' marital status or, at least, if the chain of record title had revealed that he was married. Anyone with experience of lawyers who are conveyancing specialists and officials of title insurance companies knows that the fat would have been in the fire had the existence of Doris Devers been brought home to them.

Yet, applying the instantaneous seisin approach adopted by the panel majority,[27] full and unquestioned knowledge in 1972 that Malcolm Devers had a wife would not have interfered with the title of the grantees, Brandt and Brown, except to the extent of the clearly already preexisting extant inchoate dower obligation to pay one-third of the rent of $60,000 *per annum* for the period between the demise of Malcolm Devers and the death of Doris Devers

---

**26.** It is to be observed that what was involved in those instantaneous seisin cases was not truly a disregard of seisin or dower, but only a question of whether a simultaneously effective document takes precedence over the instrument creating seisin. A husband acquiring fee simple title to a property residential or other, acquires seisin. The instantaneous seisin cases merely hold that the dower interest created by the seisin deriving from the deed is subordinate to a contemporaneous mortgage, not that there is no seisin or no dower. Upon release of the mortgage, unsubordinated dower in the real estate would exist. 1 *Minor on Real Property* § 340 (1908) ("If the land comes to the husband *already charged* with a lien, such as a ... mortgage or deed of trust, the lien encumbrance is paramount to the wife's dower, and she is therefore entitled to dower *in the surplus only,* unless the encumbrance is dis-

charged by the husband in his lifetime, ... in which case the wife's dower right in the land revives.") (footnote omitted); *Selb v. Montague,* 102 Ill. 446, 450 (1882) ("If the husband in his life pays the mortgage, he acquires title to that interest in the land which at the time of marriage was in the mortgagee, and the wife's right to dower attaches to the same as to an interest in land bought by the husband during coverture.").

**27.** It seems evident that a title company need not concern itself about insisting on a known wife's relinquishment of dower to the extent of a mortgage lien, in property acquired by a deed to the husband with which the husband's purchase money mortgage is simultaneous. 1 *Minor on Real Property* § 269.

which was unquestionably due even had there been no 1972 deed.

· Such a conclusion would consequently totally ignore a blatant attack on inchoate dower rights. It appears to me unlikely to be condoned by a Virginia court, and it is the Virginia law we must here apply. As a minimum, therefore, remand should properly be required to permit Doris Devers to probe the *bona fides* of Brandt and Brown. The district court, over objection, ruled out such an inquiry, but the reason therefor here advanced may not have been apparent. Of course, insofar as I am concerned, such a remand should not be necessary, for, regardless of an assumption that Brandt and Brown were altogether *bona fide*, nevertheless, Doris Devers is entitled to $213,333 *per annum* for her lifetime, accounting from July 27, 1974 (subject perhaps to adjustment for betterments).

Where my panel colleagues and I part company, and do so emphatically, is in the identification of what was the nature of what Doris Devers owned in the way of dower. They concentrate on the wrong person. They attempt to solve the problem on the basis of what Malcolm Devers had, not on the basis of what Doris Devers had: "After 1963, Malcolm Devers had no greater estate than the fee simple subject to the 99 year lease." Majority at 1281. "The most during coverture that Malcolm ever had to give away was the right to receive rents from the lease and the reversion." Slip Op. at 8. As to the two-thirds of the fee not subject to dower, my panel colleagues are correct. As to it Doris Devers asserts no interest. Everyone agrees that, with cancellation of the lease and the assignment of the reversion, Brandt and Brown had title in fee simple absolute, unencumbered by any interest of Doris Devers in the two-thirds not subject to dower.

With respect, I suggest that my panel colleagues have mistakenly permitted the solution as to the two-thirds to obliterate the manifest differences attaching to the one-third of the fee which was subject to dower, an interest in Doris Devers. First

and foremost, it should be emphasized just what the nature of Doris Devers' interest was. She did not simply have a right to one-third of the $60,000 *per annum* in rentals during such period as she should survive Malcolm Devers (and, for life, the essentially ephemeral reversion after the expiration of the 99 years).

Instead, she had from 1963 to 1972 an interest for life in one-third of the fee simple absolute, inchoate since it depended on her surviving Malcolm Devers, and, at the same time, subordinate, to the 99 year term. The difference is crucial since being subordinate is altogether different from being nonexistent. It is like unto the situation in which one makes a gift of not simply one drawer in a filing cabinet, but of the entire filing cabinet subject to superior interests of others in all drawers save the one. The superior interests may be marked by sealing tape, but once that tape is finally and irrevocably removed, signaling the end of the interests of others, the donee is the owner of the contents of the entire filing cabinet.

Here the interests in Brandt and Brown superior to the rights of Doris Devers entirely depended on their existence prior to the November 1, 1963 marriage of Doris Devers and Malcolm Devers. The nullification, the voiding, the cancellation of the October 22, 1962 lease wiped out any interest under it superior to Doris Devers' dower. Her dower had existed since November 1, 1963, and hence was superior to any fee in Brandt and Brown resulting from the transaction in 1972, eight and one-half years subsequent to its creation.

A major fallacy is to be perceived in the assumption made by the district judge and adopted by the panel majority that Doris Devers' dower could not exceed what Malcolm Devers, in the beneficial sense, had to give away. The fallacy is not difficult to identify. Suppose Malcolm Devers at some date after November 1, 1963 conveyed away to an independent third party his rights to $60,000 *per annum* for the balance of the 99 years, and the reversion. Certainly that conveyance would be subject

to Doris Devers' dower. *See Shell v. Duncan*, 31 S.C. 547, 567–68, 10 S.E. 330, 336 (1889):

> Now, what is the right, title, and interest which a married man has in land of which he is seised during coverture? It certainly is not such an absolute, unqualified interest as would enable him to alienate it, free from the claim of dower, either by deed or devise, but his alienation is always subject to the wife's right of dower, which can only be released or extinguished by her own act. Nothing that the husband may do, can in any way affect it. From this, it follows that when the right, title, and interest of the husband is sold, either directly by himself, or through the medium of an officer of the law, the purchaser takes no more than what was sold,—the right, title, and interest of the husband, which does not include the dower interest; and hence the purchaser must take his title subject to the wife's right of dower.

Thereafter, for reasons always possible, though in this instance they have not happened, *see* note 24 on page 1291, imagine that business took a turn for the worse and Brandt and Brown decided to terminate the lease. That would serve to accelerate the reversion, but to a date subsequent to November 1, 1963 and, hence, subordinate to dower. Doris Devers would then, on her dower's becoming consummate on July 27, 1974, be entitled to one-third of the fee for life, unencumbered by the 99 year lease. She would be so entitled though "[t]he most during coverture that Malcolm ever had to give away was the right to receive rents from the lease and the reversion." Majority at 1282.

In short, the cancellation of the lease and the sale of the property occurred on the same day, interdependent and contemporaneous, *insofar as Malcolm Devers was concerned*. But their interdependency on April 14, 1972 meant nothing insofar as the interests of Doris Devers were concerned because the date of significance to her interests was November 1, 1963. When the question is addressed from the point of view of *her* interests, and not those of the

scoundrelly Malcolm Devers, the proper result seems inescapable. For over two years prior to Malcolm Devers' death she owned inchoate dower in one-third of the fee unencumbered by the once superior 99 year lease, since it had been nullified, voided and cancelled. (Any one of the three should suffice, but in the lawyer's tautological way the total wiping out of the lease was accomplished three times.)

It is not surprising that my panel colleagues rely not at all on the concept of merger to achieve their desired result on the basis of the contemporaneity and interdependence of the two transactions of April 14, 1972, for the most that merger would accomplish would be the amalgamation of the lease and the reversion into a fee simple absolute as of April 14, 1972. Nothing subsequent to November 1, 1963, however, can affect dower adversely to Doris Devers, since she has done absolutely nothing to worsen her position since the date of the marriage.

It is interesting that Judge Wilkinson in the majority opinion turns to the situation involving a mortgage. If a husband, subsequent to marriage, simultaneously buys and mortgages Blackacre, the doctrine of instantaneous seisin applies to subordinate his wife's dower to the mortgage lien. But, if eight and one-half years down the road the mortgage is refinanced, the holder of the replacement mortgage must obtain the wife's signature to the papers or otherwise the wife's dower will be superior to the mortgage. *Sondley v. Caldwell*, 28 S.C. 580, 582, 6 S.E. 818, 819–20 (1888). Incidentally, *Caldwell* establishes that the right of the wife is what counts in determining the extent of a dower interest, despite the fact that it exceeds that of the husband:

> We mean to say that certainly between the execution of the deed and the time for recording, the title of John R. was complete as between him and his grantor. This was during the coverture, and it was sufficient for the inchoate right of the wife to attach. It is said, however, that the failure to record on the part of

the husband defeated his title as to subsequent creditors and purchasers, and that thereby the dower was also defeated. We do not see, however, that the conclusion claimed necessarily follows, even though the first position be correct. Such a rule, besides putting the wife at the mercy of her husband in the matter of her dower, would make her responsible for failing to do an act which she had no power to do. She is not the custodian of the deeds of her husband. Nor has she any authority to superintend or direct their record. Her claim to dower is a legal claim, derived to her by operation of law, attaching upon the existence of certain facts, and after it has once attached even inchoately no acts of her husband, either of omission or commission, can defeat it.

In light of the nullification, voiding and cancellation of the 99 year lease, there is simply no way to revive, as of a date prior to November 1, 1963, an interest in Brandt and Brown of equal dignity with, much less superiority to, Doris Devers' dower. It is no answer that Brandt and Brown, had they thought of it, would surely have attempted to structure the April 14, 1972 transaction in such a way as to leave the 99 year lease in effect. Even assuming that could have been done, it was not done. They joined in the cancellation of the lease. It is elementary that a court may not write for the parties a contract to say something other than what the parties have themselves chosen in drafting the agreement. *E.g., Livernois v. Warner-Lambert Co., Inc.,* 723 F.2d 1148, 1156 (4th Cir.1983); *Lasiter v. Pet Dairy Products, Inc.,* 246 F.2d 747, 750 (4th Cir.1957).

Extremely instructive as to the nature of dower and the application of its principles is *Gainey v. Anderson,* 87 S.C. 47, 68 S.E. 888 (1910). There a husband and wife jointly contracted to pay a debt of the husband. As security, the husband gave a mortgage on a tract of land, the wife joining so as duly to renounce her dower. Subsequently, the debt still being outstanding, the husband and wife by a joint deed with usual covenant of general warranty conveyed the land in satisfaction of the mortgage. The wife did not, however, in that deed renounce dower. Satisfaction of the debt acted fully to terminate the mortgage given to secure it.

The wife, upon her husband's death, successfully asserted her claim to dower, against a contention that the situation was one where the creditor could have foreclosed the mortgage, and thereby have extinguished her dower subordinate to it. The point was that the creditor/grantee instead accepted a conveyance by deed subordinate to dower in satisfaction of the debt, rather than following a route open to him of relying on foreclosure of the mortgage which was superior to the wife's dower. The fact that, at the time the debt secured by the mortgage was satisfied the husband no longer had any interest in the land from which to transfer anything to the wife was not even considered relevant enough to merit mention.

The argument of the grantee/creditor was "that the parties ought to be allowed to do for themselves voluntarily, and without expense, and with the same result what the court would have compelled at great expense." However, the court flatly held: "But, when the parties deal with the situation themselves by a new contract, the court can give to their contract no greater force or effect than its terms import under the rules of law. A release of dower on an instrument—whether a lease, mortgage, or deed of conveyance—attends upon and is incident to the principal conveyance, and endures with it and no longer. If the principal conveyance never takes effect, *or if it is satisfied or extinguished by the act of the parties or by operation of law,* the dower reverts, eo instanti, to the wife." (Emphasis supplied). The South Carolina court went on to deny any effect to the contention that "it would have been to the interest of the mortgagees" to keep the mortgage alive.

The case squarely supports a holding that the cancelled, nullified and voided lease of October 22, 1962, entirely dead

following the April 14, 1972 transaction, no longer had any effect on the dower of Doris Devers. The court in *Gainey v. Anderson* was not in the least influenced by the consideration that the result was an unanticipated one insofar as the creditor/grantee was concerned, one indeed wholly contrary to what he had expected. The disappearance of the mortgage superior to dower in *Gainey v. Anderson* was altogether analogous to the cancellation of the October 22, 1962 Devers' lease. Indeed it was an even more sweeping application of the principle, for the alternative route open in *Gainey v. Anderson* to the creditor/grantee was direct and available. Yet it was not substituted by the South Carolina court. However, the keeping alive of the October 22, 1962 lease and its superiority to Doris Devers' dower, would have been far more difficult of judicial achievement when the objective of Brandt and Brown was to wipe out entirely the lease payments of $60,000 *per annum,* and accelerate in themselves the reversion, *i.e.,* fee simple title, and they explicitly and formally pronounced the termination of the lease.

*Gainey v. Anderson* also disallowed a contention of estoppel of the wife based on the covenant of general warranty she had given in the deed in which she joined. The question of estoppel, of course, does not even arise in the case of Doris Devers since she did absolutely nothing even arguably to raise an estoppel.

Things got strangely twisted around in the district court, with Doris Devers' counsel, while relying principally on the foregoing arguments for a dower equal to 8% of one-third of $8,000,000, or $213,333 *per*

*annum,* (subject perhaps to adjustment for betterments) also striving to turn the lease for years from a sow's ear to a silk purse by claiming not only dower calculated on the basis of a reversion value in 1974 of $8,000,000, coincidentally identical with the July 27, 1974 value of the entire fee, but, *in addition,* 8% per annum on one-third of the lease's capitalized value on July 27, 1974, of $750,000. Counsel for Doris Devers would, in my judgment, have been well advised to decline any "gift" of that kind, even if offered on a silver salver. The argument, on close examination, was so necessarily specious that it may well have detracted from the weight to be accorded to counsel's principal and valid argument that Doris Devers' dower, unsubordinated to a lease no longer existing on July 27, 1974, was worth $213,333 (8% of one-third of $8,000,000) *per annum.*[28] The lease, on July 27, 1974 was a chimera. It did not then, the date of controlling significance, exist in any way, shape or form.[29]

In essence, the panel majority has decided to value dower not as of July 27, 1974, the appropriate date, but on the basis of an adjustment from a far earlier date, *i.e.,* October 22, 1962 when the term of years was quite legitimately created by Malcolm Devers when he was not yet married, *i.e.,* a time as of which dower had not, even in inchoate form, arisen. That is so because as of that date the value of the lease term to the lessor could in large measure be calculated, not only as of the date of its creation, but also, on a steadily declining basis, as of any subsequent time until expiration of the 99 years. That choice of date by the panel majority essentially wiped out an important characteristic of dower to

---

**28.** While chiding counsel at the tactical level, I wish also to express myself, on a procedural point, about the ungracious status of the Joint Appendix with which the members of the court panel have been forced to wrestle. All counsel in the case share responsibility for the submitting of largely illegible copies of the instruments, deeds and lease, comprising the chain of title. The reproduction process, when applied to exhibits themselves white-on-black photostats turns out, in large part, pure gibberish. At best they contribute unduly to eyestrain.

**29.** The reader must excuse a slight exhibition on my part of the tautology of lawyers.

Since the 99 year lease plays no proper part in valuing Doris Devers' dower, obviously, I do not accept the panel majority's view that Doris Devers is not entitled to more than 8% per annum of one-third of $750,000 (a life interest of $20,000 per year) plus the value of a life estate in one-third of the reversion following expiration of the 99 year lease (a figure variously estimated at $1600.00 to $20,800.00).

which Doris Devers had on April 14, 1972 become entitled, namely, fluctuation in value due to market forces while the dower remained inchoate. While a decline in value of the fee by the time of Malcolm Devers' death could, in legal theory, have operated to Doris Devers' disadvantage, in fact the fluctuation was very much in her favor, from something probably under $1,000,000 to $8,000,000.

Indeed the defendants were, as things have turned out, lucky. Had Malcolm Devers lived a few years longer, by late 1979, the value of the land subject to dower as of the date of his death would have mushroomed to $23,000,000, and the value at the time of his death is what Doris Devers is entitled to have used for the purposes of calculation of her dower interest. Va.Code § 64.1–39. At $23,000,000, one-third thereof times 8% equals $612,222. While the number of years for which her consummate annual dower would be payable would be less, she has lived over five years since December 1979 or January 1980. The enhancement for five years of $398,889 ($612,222–$213,333) per year would more than make up for the yearly loss of $213,-333 for a similar period of time. As time goes on, with Doris Devers still alive, the advantage to her had Malcolm Devers' own death been postponed, would assume even greater proportions.[30]

Accordingly, while I agree that it was error to make an award based on *both* the value attributed to the right to receive a portion of a) the annual rental for the balance of the term of years and b) the value of a reversion coming thereafter[31] equal, incidentally, on the basis of the district judge's findings, to the full present value of the fee itself, nevertheless, the award should be $213,333.33 *per annum* (subject perhaps to adjustment for betterments), not the far lesser amount fixed by the panel majority of $20,000 (8% of one-third of $750,000) plus 8% of one-third of the reversion after expiration of the 99 year lease which was theoretically possible in Doris Devers' lifetime but, indeed, entirely non-existent, as a practical matter.[32]

We perhaps should pause to contemplate the case, absent all the arcane considerations such as seisin and dower which have obscured the situation. Those terms have ancient lineage and aspects given only a few to encounter on any ongoing basis. They add an unnecessary mystery to the proceedings. Casting those terms aside, the problem is simple. Effective July 27, 1974 there was a fee simple absolute to place a price tag on. Since a one-third interest therein is subject first and foremost to a life estate in the widow unencumbered by any superior interest, the only previous interest ahead of it having been cancelled and declared null and void, Doris Devers is entitled, as a surviving spouse, to possession for life therein, and at the initial stage no occasion for fixing values arises.

However, a residential complex of the size here involved would encounter serious complications and adversities if Doris Devers were in a position even temporarily. *i.e.*, during her lifetime, to eject occupants of up to one-third of the properties. To

---

30. The defendants can also breathe a collective sigh of relief that the 1977 enhancement of dower from a life estate to a fee set forth in Va.Code § 64.1–19 relates to the date dower first comes into being and not, even assuming Malcolm Devers had lived on until 1979, the date it becomes consummate.

31. Note that the district judge's approach is purely and simply to disregard totally, for purposes of ascertaining dower, the 1971 and 1972 deeds. The dower he found Doris Devers entitled to, a share of the rents under the 99 year lease plus a share of the reversion on its termination, was exactly what she unquestionably owned on and after November 1, 1963. She

never joined in any conveyance thereof, so her dower could only increase, not decrease. The district judge allowed no increase whatever in the *quantum* of interests comprising dower as a consequence of the 1971 and 1972 deeds. It was but a coincidence that his *valuation* approximated, indeed exceeded, the correct amount.

32. Were it proper to calculate the value of that reversion, rather than the fee, I would agree with the panel majority that a present worth of $8,000,000 for property coming into possession and enjoyment only in 2062 is inescapably inconsistent with a value of $8,000,000 for the same property available at the present time.

spare the possibility of such a misfortune, the option under Va.Code § 64.1–39 has sensibly been exercised enabling those subject to her superior interest to pay Doris Devers off in cash. That again presents no problem since her interest is not subordinated to any other interest. The parties are agreed that the property on July 27, 1974 was worth $8,000,000. One-third is, of course, $2,666,667 and annual payments, calculated on an 8% basis, work out at $213,333.

One final note may not be amiss. The lien of $213,333 *per annum* (subject perhaps to adjustment for betterments) which I believe is due during Doris Devers' lifetime inevitably sounds a heavy burden on innocent purchasers saddled with their proportionate shares of that imposition.[33] It should be borne in mind, however, that numbers related to real estate magnify at a frightening pace. It should not be overlooked that $213,333 works out to less than 1% of $23,000,000 ($1500 on a residence valued at $150,000). Such an annual charge for the years from 1974 to the date of Doris Devers' death, when broken up among all the owners holding sub-divided interests in Radnor Heights, is not an intolerable one, approximating an increase in real estate taxes which might well have been levied and grumblingly tolerated by the residents of Radnor Heights.

Also, the occurrence is archetypically of the type which title insurance companies are organized to protect purchasers against. Those companies customarily reap handsome profits for successfully ferreting out and excepting from policy coverage such a title defect as we have here. Through a title company's activities, the problem customarily arises and is disposed of prior to settlement of a transaction such as that embodied in the April 14, 1972 deed. Title insurance companies perform a valuable social function, and to the extent title policies cover the situation here, the loss will have found its way to a not inappropriate door or doors, namely, the portals of

those whose business it was to find out in timely fashion about Malcolm Devers' machinations.

I purposely refrain from commenting on the possibility of any relief against Malcolm Devers' attorney, Dalonas, which may be available to the defendants, or any title company that may have insured a Radnor Heights fee for one of them. The issue is posed in pending litigation against Dalonas which has been severed and is awaiting trial, a determination and direction under Fed.R.Civ.P. 54(b) having produced a final judgment ripe for appeal of the issues dealt with by the panel majority in the Court's opinion and by me in my dissent.

---

**33.** It is premature, of course, to talk of their possible reimbursement from Brandt and

Brown or indemnification by John Dalonas, the lawyer who represented Malcolm Devers.